Juanita CAUSEY, Plaintiff-Appellant,

v.

FORD MOTOR COMPANY et al.,
Defendants-Appellees.

No. 74–2373.

United States Court of Appeals,
Fifth Circuit.

July 24, 1975.

Reese Marshall, Larry R. Jackson, Earl M. Johnson, Jacksonville, Fla., for plaintiff-appellant.

Gary B. Tullis, Jere D. McWinn, Jacksonville, Fla., for Ford Motor Co.

Richard H. Frank, Tampa, Fla., for United Automobile Workers, etc. and Local 970.

Before BELL, DYER and SIMPSON, Circuit Judges.

BELL, Circuit Judge:

This appeal is taken from a judgment adverse to appellant Juanita Causey in her employment discrimination action against Ford Motor Company, the United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) and its Local 970. Suit was brought under Title VII of the Civil Rights Act of 1964 [42 U.S.C.A. §§ 2000e–2(a) (Ford), 2000e–2(c) (the Union)], appellant alleging discrimination based on sex in Ford's hiring and employment practices, and in the union's employee representation.[1] The district court ruled that appellant had failed to establish by a preponderance of the evidence her claims against either Ford or the union. Causey v. Ford Motor Co., M.D.Fla., 1974, 382 F.Supp. 1221. We affirm in part and reverse in part as to Ford, but affirm as to the union.

## I.

The Ford parts distribution warehouse in Jacksonville, Florida, regularly employs between sixty and sixty-five persons. The warehouse taps three basic sources for new employees: referrals from present employees, referrals of minority group members from the National Alliance of Businessmen, and unsolicited, "walk-in" applications. Prior to the date of appellant's application, a woman had never been hired at the warehouse, although four women had applied. Ford did not have a recruitment program aimed at hiring women.

Appellant experienced three employment phases with Ford. She was first hired on July 29, 1971, and worked for one week before being laid off because of a reduction in Ford's work force. Appellant was rehired in October 1971, but was laid off a second time the same month. Her third period of employment began on March 6, 1972, and lasted for nearly two years (throughout most of the period of the suit). She was laid off for the third and last time on January 18, 1974.

On January 18, 1971, appellant filed an application for employment with Ford, having been referred by her husband, who was, at the time, also employed at the warehouse. Although Ford offered her a job as a stockhandler on July 29, it hired five males for the same position during the interim, all of whom had applied for jobs after appellant. The warehouse supervisor in charge of hiring testified that he did not compare applicants for job openings, but chose specific persons based upon his "subjective appraisal" of their qualifications for the desired positions.

Of the five males hired during the January-July interim, the first, who was hired on April 13, had previous experience at another warehouse; another was an NAB minority group referral; a third was a "walk-in" applicant with experience at a Ford parts depot; two others were sons of warehouse employees.

In May 1971, appellant went to the warehouse to discuss possible job openings with the warehouse supervisor and the local union president. The latter told her that her employment chances would be greater were she to picket the warehouse. As a consequence, appellant picketed Ford for three days during May. The warehouse supervisor testified that appellant's picketing was an indication of her serious desire to work for Ford, and she was hired two months later. It is undisputed that no male applicant was required to picket in order to show interest in, or gain employment with, Ford.

During appellant's initial week-long employment, she was subjected to hazing by her fellow employees, a customary experience for new workers. Called the

---

1. Pursuant to Section 706 of the Equal Employment Opportunity Act of 1972 [42 U.S. C.A. § 2000e–5], appellant filed charges with the Equal Employment Opportunity Commission on June 9, 1971, charging Ford and the union with violations of Title VII of the Civil Rights Act of 1964. On April 28, 1972, the E.E.O.C. advised appellant of her right to institute action against Ford and UAW, and suit was filed within thirty days thereafter.

"box treatment," this hazing involved the throwing of an inordinate number of used boxes into the aisles that appellant was cleaning for her to discard. Appellant also testified that the women's restroom was not appropriately marked, and that both janitorial supplies and union literature were stored therein.

On August 5, appellant was laid off due to a reduction in work force, and not rehired until October 4, 1971. Ford hired five male stockhandlers, all of whom had applied for jobs after July 29, prior to rehiring appellant. Under provisions of the collective bargaining agreement between Ford and the union, appellant, as a probationary employee, had no right to be recalled by Ford.[2] Ford has alleged, moreover, and the district court found, *inter alia*, that there were palpable reasons for not immediately rehiring appellant: (1) her job performance had been marginal, if not substandard; (2) she had had a disruptive influence on the warehouse operations; and (3) her husband had requested a transfer subsequent to the July 29 lay-off.

Nevertheless, appellant was rehired on October 4 and worked until October 29, when she was laid off during another work force reduction. It was not until March 6, 1972 that she was rehired for the second time, but thereafter, she worked at the warehouse until January 18, 1974.

This action was commenced on May 16, 1972.[3] Appellant charged that Ford's (1) recruitment procedures, (2) failure initially to hire her prior to hiring male applicants for the same position, (3) failure to rehire her during the July-October 1971 interim prior to hiring males for the same position, (4) failure to provide adequate restroom facilities, and (5) condonation of employee hazing, were violations of 42 U.S.C.A. § 2000e–2(a).[4]

2. Article VIII, Section 4 of the collective bargaining agreement between Ford and UAW provides:

(a) Acquiring Seniority

New employes and rehired employes shall be regarded as probationary employes and shall establish seniority after the first three (3) months of continuous employment with the Company, and if retained thereafter shall be placed upon the seniority list in the seniority group in the Unit or plant where they are then working with seniority as of the date of hiring. In order to become a seniority employe, a probationary employe must have been employed for a total of three (3) months within the year following the date he was hired or last rehired, whichever is the later. For the purposes of this Section, periods during which the employe was laid off, or on leave of absence for any reason, or employed on an excluded classification, shall not be considered as periods of employment.

Following completion of his probationary period, the employe shall be given seniority as of the date he was hired or last rehired, whichever is the later, as set forth in the first paragraph of this Subsection.

\* \* \* \* \* \*

(c) Probationary Employes—Layoff and Recall

When possible, the Company shall adhere to a policy of laying off and rehiring probationary employes, within an occupational group, or within the Labor Pool, in accordance with their date of hire, provided that the Company shall retain the sole discretion as to the laying off, transferring and rehiring of probationary employes, except in cases of claimed discrimination.

3. The action was originally filed by appellant "on her behalf and on behalf of other persons similarly situated who have been denied or been dismissed from employment by the Ford Motor Company at its plants and/or other facilities located in the State of Florida, and in and around the City of Jacksonville." On February 26, 1974, the district court disallowed class action status for lack of numerosity and adequacy of representation by appellant. This order has not been challenged on appeal.

4. 42 U.S.C.A. § 2000e–2(a) states that it shall be an unlawful employment practice for an employer

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Appellant's claims against the union[5] stem from the latter's alleged condonation of employee hazing (i. e., the box treatment discussed *supra*), and its alleged failure sufficiently to pursue the grievances filed by her against Ford.

These grievances began in October 1971 when appellant grieved that she had been denied a forklift operator's license. She testified at trial that she had voluntarily abandoned this grievance and did not fault the union therefor.

On March 21, 1972, appellant grieved that the two lay-offs that she had experienced were the result of sexual discrimination. This grievance was prepared by the union president, presented to Ford's warehouse foreman, and denied by him two days later. A union committee later agreed that this grievance was without merit.

A third grievance was filed in early June 1972. Appellant had been promoted from stockhandler to "warehouseman" in May, but was demoted on June 2. She complained to the union and a grievance was filed. The processing of the grievance culminated in an arbitration award granting appellant the claimed position. (This grievance was concerned with an event which took place after the filing of suit but was included as an issue by pre-trial stipulation.)

■ Appellant sought injunctive relief against both Ford and the union, as well as back pay, compensatory seniority, and attorneys' fees. The district court denied all relief, holding that appellant had failed to establish discrimination by a preponderance of the evidence on any ground alleged.[6]

By way of a preliminary summation, we find error only in the holding of nondiscrimination in the original hiring of appellant. The district court will be affirmed in all other respects.

## II.

■ At the outset, it is important to delineate our standard of review for assessing the correctness of the district court's nondiscrimination findings. Rule 52(a), F.R.Civ.P., lays down the "clearly erroneous" test for appellate review of district court findings of fact. Under this test, a finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" by the district court. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766. *See also* Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774, 776.

There exists, however, a significant distinction for the purpose of applying the clearly erroneous test between findings of subsidiary fact and findings of ultimate fact. *See* Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217, 219–20. Finding a subsidiary fact involves the determination of an evidentiary or primary fact; finding an ultimate fact, on the other hand, "may involve the very basis on which judgment of fallible evidence is to be made." Baumgartner v. United States, 1944, 322 U.S. 665, 671, 64 S.Ct. 1240, 1244, 88 L.Ed. 1525, 1529. Thus, for example, a finding of infringement of a patent is a finding of ultimate fact, *see* Industrial Instrument Corp. v. Foxboro Co., 5 Cir., 1962, 307 F.2d 783, 786 n. 2; as is a finding that a gain

---

5. By pre-trial stipulation, it became clear that the national union was being charged through the alleged conduct of the local. We refer to both as the "union".

6. As to each alleged act of discrimination, appellant had the burden of establishing a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 1973, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, 677. Once a prima facie case was established, the burden "to ar-

ticulate some legitimate, non-discriminatory reason" for their action shifted to the appellees. *Id.*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. *See also* Pond v. Braniff Airways, Inc., 5 Cir., 1974, 500 F.2d 161, 167. Upon rebuttal evidence being offered, the ultimate burden of persuasion by a preponderance of the evidence that discrimination had taken place fell upon appellant's shoulders. *Cf.* Bittar v. Air Canada, 5 Cir., 1975, 512 F.2d 582, 582–83.

should be treated as capital rather than ordinary for income tax purposes. *See* Gamble v. Commissioner, 5 Cir., 1957, 242 F.2d 586, 590. With respect to ultimate findings of fact, furthermore, we noted in Industrial Instrument Corp. v. Foxboro Co., *supra*, 307 F.2d at 786 n. 2:

> We may reverse free of the clearly erroneous rule where . . . the issue revolves around an ultimate fact question as distinguished from subsidiary fact questions . . . .

*See also* Galena Oaks Corp. v. Scofield, *supra*, 218 F.2d at 219.

■ Although discrimination *vel non* is essentially a question of fact it is, at the same time, the ultimate issue for resolution in this case, being expressly proscribed by 42 U.S.C.A. § 2000e–2(a). As such, a finding of discrimination or nondiscrimination is a finding of ultimate fact. *See* Hester v. Southern Railway Co., 5 Cir., 1974, 497 F.2d 1374, 1381; United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418, 423–24. In reviewing the district court's findings, therefore, we will proceed to make an independent determination of appellant's allegations of discrimination, though bound by findings of subsidiary fact which are themselves not clearly erroneous. Also, as in Humphrey v. Southwestern Portland Cement Co., 5 Cir., 1974, 488 F.2d 691, 694, we must determine whether there are requisite subsidiary facts to undergird the ultimate facts.

### 1. Ford's Recruitment Methods

■ Appellant contends that the district court erred in finding Ford's recruitment methods to be nondiscriminatory. It is agreed that Ford hires new warehouse employees from three sources: walk-ins, employee referrals, and NAB minority group referrals. Prior to appellant, four women had sought employment at the warehouse, all without success.[7]

■ Review of the merits of appellant's contention on this point has become unnecessary, however, because of the coalescence of two factors. First, appellant herself was recruited and hired through one of the allegedly discriminatory methods: her husband, a Ford employee, referred her for the job. Thus, she cannot claim individual injury from recruitment discrimination.[8] Second, appellant is not representing a class of discriminatees. *See* note 3 *supra*. Consequently, class relief for recruitment discrimination automatically becomes inappropriate within the context of this dispute.[9]

### 2. Ford's Initial Hiring of Appellant

Appellant's claim of discrimination in Ford's original decision to hire her rests upon a more solid foundation. The district court concluded that the three males hired in April and May 1971 before appellant was hired in July "were hired solely on their qualifications to perform the work at the warehouse fa-

---

7. Testimony was adduced at trial that between July 1971 and March 1974, approximately seven women were hired by Ford, resulting in a ten percent female workforce at the warehouse. It is well-settled, however, that "[w]hatever the nature of present hiring practices, they neither explain nor justify, without more, the past failure to hire minority . . . [job applicants]." Rodriguez v. East Texas Motor Freight, 5 Cir., 1974, 505 F.2d 40, 54. *See also* Gamble v. Birmingham S. R. R. Co., 5 Cir., 1975, 514 F.2d 678; Rowe v. General Motors Corp., 5 Cir., 1972, 457 F.2d 348, 359; Jenkins v. United Gas Corp., 5 Cir., 1968, 400 F.2d 28, 33.

8. A similar result obtained in DeFunis v. Odegaard, 1974, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164. There, petitioner sued the respondent law school for alleged reverse racial discrimination. No class relief was sought, and petitioner's individual claim was found to be moot. In effect, petitioner had no case against the law school because he had suffered no real injury, having been admitted and allowed to complete his course of study there.

9. Where courts have found recruitment methods to be in violation of 42 U.S.C.A. § 2000e–2(a), the relief granted has usually been in response to class discrimination aspects of the respective cases. *See, e. g.,* Pettway v. American Cast Iron Pipe Co., 5 Cir., 1974, 494 F.2d 211, 244–45; United States v. Georgia Power Co., 5 Cir., 1973, 474 F.2d 906, 925–26; Parham v. Southwestern Bell Telephone Co., 8 Cir., 1970, 433 F.2d 421, 425–28.

cility." The significance of appellant's picketing in May was reduced, in the view of the court, by the facts that no job openings existed at the time, and appellant was unaware of the qualifications of the previously hired males.

The other males were hired one and two days before appellant, and thus, the court apparently reasoned, essentially simultaneously with her. Ford's ultimate decision to hire appellant when a job opened up in July, furthermore, "demonstrated . . . that it did not pursue a policy of sex discrimination against her," in the words of the court. In sum, the court concluded that appellant had failed to establish unlawful discrimination by the requisite evidentiary preponderance.

■ In the first place, Ford's decision ultimately to employ appellant in July 1971 has no bearing upon alleged discrimination against her during the January–July interim. During this period, five males were given employment in the same position for which she was applying. If she was not hired before them solely on the basis of her sex, Ford's later job offer could not right the statutory wrong that it had earlier committed. *See* Parham v. Southwestern Bell Telephone Co., 8 Cir., 1970, 433 F.2d 421, 426; Jenkins v. United Gas Corp., 5 Cir., 1968, 400 F.2d 28, 33.

■ Second, the conclusion that the near-simultaneous hiring of appellant and two of the five males somehow mitigated any discrimination that might have taken place misses the mark. The fact is that appellant, having applied before the men, was passed over for jobs given them. The temporal relationship between employment dates is significant whether the time span between dates is large or small because Ford's seniority roster relates back to the date of hiring,[10] and employees during their first

ninety days are laid off and rehired "[w]hen possible . . . in accordance with their date of hire."[11] Thus if, because of her sex, appellant was not hired before the men, Ford will not be allowed to discount such discrimination by mingling appellant's initial employment date with the dates the two men were hired.

■ The district court's finding of no unlawful discrimination by Ford in the initial hiring stands or falls, therefore, upon the determination that the previously hired males were better qualified than appellant for the job openings at the warehouse. *Cf.* Griggs v. Duke Power Co., 1971, 401 U.S. 424, 436, 91 S.Ct. 849, 28 L.Ed.2d 158, 167. Appellant's burden at trial was to produce evidence to establish a prima facie case of sex discrimination. *See* note 6 *supra. Cf.* McDonnell Douglas Corp. v. Green, *supra*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677–78 & n. 13 for the general prerequisites to establishing a prima facie case under Title VII. In our view, the evidence presented successfully carried this burden:

(1) It was stipulated that prior to appellant, no woman had been employed at the warehouse, although four had applied.

(2) Testimony was adduced that five males were hired by Ford for the position appellant sought even though all had applied after her. Two of the five had prior warehouse experience. The job of stockhandler, for which they were hired, required no technical expertise or experience, although lifting 25–50 lb. pallets was involved. Appellant admittedly had no previous warehouse experience.

(3) The decision to hire the males before appellant was based, according to testimony of Ford's warehouse supervisor, on his "subjective appraisal" that

---

**10.** Under Article VIII, Section 4 of the Ford-UAW collective bargaining agreement, an employee establishes seniority only after ninety days of continuous employment. Seniority, once established, refers back to the date of hire or rehire, whichever is later. Appellant gained seniority in June of 1972, with March 6, 1972 being the latest date that she was rehired.

**11.** Article VIII, Section 4(c) of the Ford-UAW collective bargaining agreement.

they were "better qualified". His appraisal at the time was that appellant was not qualified, but he was unable to point to specific items in her application or interview, other than general lack of experience, upon which to base his appraisal.

(4) Testimony was given that appellant, Ford's first woman employee, picketed the warehouse prior to gaining employment. The warehouse supervisor testified that her picketing had had a substantial effect upon his decision to hire appellant. No other job applicant had ever been required to picket to gain employment.

It was Ford's burden to rejoin this prima facie case with evidence of a "legitimate, nondiscriminatory" rationale for its actions. *See* McDonnell Douglas Corp. v. Green, *supra*. To carry the burden, Ford relied primarily upon the testimony of the warehouse supervisor that he had considered only the relative qualifications of the applicants. No objective standard was used by Ford, however, to measure the applicants' job qualifications. Other than the previous warehouse experience of two of the five previously hired men, and Ford's commitment to hire NAB referrals, the evidence demonstrated no tangible reason for hiring the men before appellant.

Pond v. Braniff Airways, Inc., 5 Cir., 1974, 500 F.2d 161, is this circuit's most recent authority on sex discrimination in subjective hiring practices. There we stated:

> Of course it is true . . . that where an employer can demonstrate no discrimination in the selection or advancement of employees, but rather that the employer in the best of faith merely weighed each person's talents then choosing the man over the woman (or the woman over the man), no case is made out under Title VII. But the inquiry does not necessarily stop here. Courts must be extremely careful to determine that the reasons given for selecting a male applicant over

a female applicant are not simply a ruse disguising true discrimination. Courts must further carefully scrutinize the employer's explanations for its conduct once the aggrieved employee has proved a prima facie case of discrimination. If the capacity or competency distinction upon which the employer's selection is based inheres in the nature of an employee as a man or a woman, or if the employer in any way permits stereo-typical culturally-based concepts of the abilities of people to perform certain tasks because of their sex to creep into its thinking, then Title VII will come to the employee's aid. 500 F.2d at 165–66. (Footnotes omitted)

*See also* Hester v. Southern Railway Co., *supra*, 497 F.2d at 1381; Rowe v. General Motors Corp., *supra*, 457 F.2d at 359.

Taking the subsidiary facts as found and developed by the district court, we are led to the conclusion that Ford failed to rebut appellant's prima facie case by offering evidence articulating sufficient, nondiscriminatory reasons for not employing appellant. Other than the reasons given *supra*, the finding of no discrimination is not supported by subsidiary facts. *See* Humphrey v. Southwestern Portland Cement Co., *supra*, 488 F.2d at 694. Thus, we reverse the district court on this point.

### 3. Ford's Rehiring of Appellant

Appellant's next claim is that her failure to be rehired in September 1971 subsequent to being laid off in August was the result of unlawful sexual discrimination. Ford hired five males who had applied for positions after July 29, 1971 (the date appellant was originally hired), before rehiring appellant in October. The district court concluded that "the hiring of new employees before the rehiring of . . . [appellant] had nothing to do with her sex."

The primary feature distinguishing appellant's rehiring discrimination claim from her hiring discrimination claim is

that Ford was able to point out nondiscriminatory reasons for its reluctance to rehire her. The Ford-UAW collective bargaining agreement gave Ford the "sole discretion" to rehire probationary employees "except in cases of claimed discrimination." A Ford executive testified, furthermore, that there were reasons for its rehiring reluctance. For example, appellant's job performance had been marginal during her initial five days of employment; furthermore, she had been a disruptive influence on the warehouse operations, and her husband had requested a transfer at the time rehiring began in September.

These reasons were sufficient, in our view, to rebut appellant's prima facie case of discrimination in rehiring. Appellant had the ultimate burden, then, to persuade the court of sex discrimination by an evidentiary preponderance. *See* note 6 *supra*. *See also* Bittar v. Air Canada, *supra*, 512 F.2d at 582–83. Independently reviewing the facts presented, we agree with the district court that appellant did not carry her burden of persuasion on this claim.

### 4. *The Restroom Facilities*

■■ Another contention is that Ford discriminated against appellant by not providing adequate restroom facilities and supplies at the warehouse. Appellant charged that no such facilities were provided at first, and that when they were, they were inadequate. The facts showed, however, that the warehouse did have a women's restroom, and that appellant was not denied its use. In it were water, soap, a toilet, a mirror, and toilet paper. Ford and the union stored material in the restroom, but mainly in its anteroom. These materials were removed shortly after appellant was initially hired.

The district court found appellant's restroom discrimination claim meritless, lacking evidentiary support. We agree.

### 5. *Hazing*

■■ Appellant contends that she was discriminated against on account of her sex by her fellow employees' hazing, (i. e., giving her the "box treatment") and that this was attributable to Ford. Since it was customary for new employees to receive the box treatment, appellant's hazing discrimination claim is reduced to a belief that she received *more* hazing than new male employees. The district court chose to find that appellant received extra hazing, if at all, because of personal characteristics other than sex.

The facts are that appellant received the box treatment throughout her first week of employment in July–August 1971, and then again during her second employment period in October 1971. Appellant's husband testified that other female employees, hired after appellant, did not receive this extra box treatment, but instead, "was [sic] treated like queens." Ford took no disciplinary action against any employee for the alleged hazing of appellant, but the warehouse supervisor testified that he had pleaded, albeit unsuccessfully, with employees to cease such activities.

Taken together, these facts evidence some basis for appellant's claim of extra hazing. Her corollary claim that the extra hazing was the product of sex discrimination is unsupported factually, however.

### 6. *The Union's Representation*

■■ Appellant's claims against the union arise under 42 U.S.C.A. § 2000e–2(c), which states:

(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or expel from its membership, or otherwise to dis-

criminate against, any individual because of his race, color, religion, sex, or national origin;

With respect to her first claim—that the union discriminated against her in processing grievances—appellant had the burden of proving by a preponderance of the evidence that the union's alleged actions were "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 1967, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842, 857.[12] The district court concluded that she had not carried her burden. We agree.

Appellant failed to prove any discrimination on the union s part in the handling of her grievances, and, as stated with respect to the claim against Ford, there was a failure of proof as to the hazing having resulted from sexual discrimination.

### III.

Because the district court found Ford's actions to have been nondiscriminatory, there was no consideration at trial of the relief due appellant. In view of our conclusion that Ford unlawfully discriminated against her during the period of initial hiring, we remand with direction that the district court accord appellant such relief as may be due under the circumstances.[13]

Affirmed in part; reversed and remanded in part as to Ford. Affirmed as to the union.

12. The union's duty of fair representation as to the processing of grievances arises within the context of the Labor Management Relations Act (29 U.S.C.A. § 158), and must be distinguished from the union's duty to employees covered by Title VII [42 U.S.C.A. § 2000e-2(c)(1)] not "otherwise to discriminate" against members in processing grievances. See Alexander v. Gardner-Denver Co., 1974, 415 U.S. 36, 48–49 & n. 9, 94 S.Ct. 1011, 39 L.Ed.2d 147, 158 & n. 9; Local No. 12, United Rubber Workers v. N. L. R. B., 5 Cir., 1966, 368 F.2d 12, 24. The fair representation duty under the LMRA, as enumerated in Vaca, overlaps with the Title VII protection, Local No. 12, United Rubber Workers v. N. L. R. B.,

supra, 368 F.2d at 24; and the Vaca standards (proscribing arbitrary, discriminatory, and bad faith conduct) apply in Title VII cases. See Macklin v. Spector Freight Systems, Inc., 1973, 156 U.S.App.D.C. 69, 478 F.2d 979, 988. See also Patmon v. Van Dorn Co., 6 Cir., 1974, 498 F.2d 544, 547.

13. The period of initial hiring begins no earlier than April 13, 1971 when the first male applicant was hired and ends July 29, 1971 when appellant was first hired. On the standards to be followed by the district court with respect to back pay relief, see generally Albermarle Paper Co. v. Moody, 1975, —— U.S. ——, 95 S.Ct. 2362, 45 L.Ed.2d 280.