Freddie D. ROBINSON et al.,
Plaintiffs-Appellants,

v.

UNION CARBIDE CORPORATION, etc.,
Defendant-Appellee.

No. 75–1008.

United States Court of Appeals,
Fifth Circuit.

Sept. 10, 1976.

J. U. Blacksher, Mobile, Ala., Jack Greenberg, Melvyn Leventhal, New York City, Caryl P. Privett, Birmingham, Ala., for plaintiffs-appellants.

Vincent McAlister, Sheffield, Ala., for defendant-appellee.

Before WISDOM and INGRAHAM, Circuit Judges, and GROOMS, District Judge.

INGRAHAM, Circuit Judge:

Nine blacks (appellants) filed a civil rights action against Union Carbide Corporation, charging it with various discriminatory employment practices perpetrated at the Chickasaw, Alabama plant. On appellants' motion the district court certified the case as a class action filed in behalf of:

Those black job applicants who had an outstanding job application at the time of the commencement of this cause and those black job applicants who have filed job applications since the commencement of this cause and all future black job applicants, along with all current black employees of defendant Union Carbide Corporation, Materials System Division.

Additionally, the district court included a provision in its Notice of Pendency of Class Action which required potential class members to "opt-in" to preserve their back pay claims.[1]

After considering all the evidence, the district court concluded that Union Carbide's hiring and promotional practices were not discriminatory and did not violate Title VII of the Civil Rights Act.[2] On appeal appellants claim that the district court's ruling was clearly erroneous and that the order requiring class members to opt-in to obtain back pay is contrary to Rule 23 of the Federal Rules of Civil Procedure and Title VII of the Civil Rights Act.

## TITLE VII CLAIMS

### 1. *Hiring Practices*

In 1965 Union Carbide opened a plant in Mobile County, Alabama for the manufacture of "molecular sieves," a product that strains and filters liquid or gaseous molecules. The work force at the plant is composed primarily of residents in the vicinity of Mobile, Alabama, an area which is approximately 26% black. When the plant began operations, the work force consisted of 35 whites and 1 black. Nevertheless, within nine years the plant hired 84 black

1. The district court's Notice of Pendency of Class Action provided in part:

If you are black and an employee or have an outstanding job application with defendant . . . and desire other appropriate relief in addition to injunctive relief, you must notify the under-signed [district court] in writing . . . said notice to be postmarked or filed not later than February 20, 1974.

2. Appellants allege discriminatory employment practices in violation of civil rights laws, 42 U.S.C. § 1981 and 42 U.S.C. § 2000e. 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. § 2000e–2 provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

. . . . .

(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

and 259 white employees. Furthermore, blacks serve in both salaried and wage-earning positions at the Union Carbide plant.[3]

Union Carbide continually accepts employment applications irrespective of the existence of current vacancies. The personnel files keep a record of applicants; whenever a position becomes available, the applications from the "active" file are reviewed for employment consideration.[4] If the files contain an insufficient number of applications, Union Carbide places advertisements in the local newspaper. Then the plant conducts short screening interviews to determine the applicants' basic vocational interests and to answer any questions relating to the job openings. Following the initial interview, selected applicants are requested to return for an in-depth interview with three or four other plant employees—usually two engineers and one foreman. The applicant also tours the plant to view the working conditions. According to Mr. James W. Garner, manager of employee relations, the plant prefers applicants who are "more likely to be long term Carbide employees [and] who want the kind of work and opportunities that [the plant has] to offer." Three members of the personnel department discuss the qualifications of each applicant and decide which of the ap-

3. There are three categories of employees at the Union Carbide plant: (1) hourly wage personnel, (2) non-exempt salaried personnel, and (3) exempt salaried personnel. Within the ranks of the hourly wage personnel, employees work in the areas of production, warehousing and maintenance. The ranks of the non-exempt salaried personnel are composed of workers who are not exempt from the Fair Labor Standards Act and are entitled to overtime compensation. Essentially, non-exempt salaried employees are secretaries, technicians and service personnel. Exempt salaried employees are not protected by the Fair Labor Standards Act and are not entitled to overtime compensation. They fill supervisory positions such as foremen and superintendents.

4. Two personnel files are maintained. One is for "active" applicants; the other is for "inactive" applicants. The manager of personnel relations, James Garner, described the initial screening process whereby an applicant is placed in either the active or inactive file:

Q Will you testify, please, what kind of factors you consider or Mr. Krogen considers when he is making that decision [to classify an application "active" or "inactive"]?
A First I would like to say that race is not on the application when we receive it.
Q We understand that.
A We don't know if it is black or white, or what the case may be. It does have male or female on the application. It does have the age and the date of the application. But when I review an application I just as a matter of routine go down the application because that's the way it was printed, and I don't look for any specific information. First I just go down to the date of it, whether the person is male or female, the weight, any physical limitations, if they know anybody at the plant, what job they are applying for, educational level, because that's next in line, and then the companies that they worked for, what kind of experience they had, how long they stayed on the job, were there any lapses of time. And then I turn it over to the rear to see the other experience that he or she had and the kind of work experience under clerical or production that they check off. And that's about it.
Q Okay. Once a decision is made to put the application in the inactive file how long will your office retain that application form?
A Two years.
Q Just two years?
A Yes sir.
Q Now, if the application is put in the active file—First of all if it goes in the active file if the person is not hired as long as his application is in the active file and he is unsuccessful tell us exactly—
A We haven't established whether we are hiring or not hiring. Let's say we don't have an opening. You haven't hired the person because—
Q Well, assume you hired him. Do you put his application somewhere else?
A It goes in our employee records file.
Q So regardless of the status of your hiring process, whether you are interviewing or whether there is vacancies or not, as long as an application is in the active file he is not yet hired?
A That's correct.
Q Now, you said that you sent some sort of notice to people who had their applications put in the inactive file. I am going to show you a couple of samples of the letters that you received from your files and ask you to identify for us what these various letters mean? You don't tell the person when you write him that your application has gone in the inactive file? You tell him something different?
A They should get the idea that they are not being considered for employment.

plicants are most qualified for the particular job opening. An offer is then extended to the candidates deemed to be most qualified.[5]

5. On direct examination counsel for the appellants attempts to establish the factors considered relevant to an employment decision:

Q [W]hat are the factors that you consider most important in reaching your [employment] decision?

A I am not sure I can answer that adequately. For instance, a person should not have had a criminal record. There are just so many factors I don't know if I could spell out or say that you do not use this factor or do use this factor. In personnel there are so many factors to use based on each individual's background and experience, and what they want, that I am not sure I can answer that in any meaningful way.

Q It is always based on the background and the experience of the interviewer or evaluator—

A That would leave that person to reach conclusion. Yes sir.

Q So that you really couldn't identify them in concrete terms as if you were preparing an outline or guide of the hiring process?

A I guess you could say that's true.

Q Based on a whole lot of factors that sort of have been accumulated in your experience as a personnel officer over the years?

A Yes sir.

The following testimony describing the attributes of a chemical operator sought to further define the general and perhaps abstract term "most qualified":

Q What are the qualifications that the company requires of people who apply for or are considered for chemical operators or chemical operator trainees, since they have to go through it?

A Well, physically they have to be able to perform the job, because the job is not one routine job. The jobs rotate, and on one side you might have 8 jobs or 10 jobs and on the other side 10 to 12 jobs and approximately every two weeks you rotate off that job to another job, and many of them are quite laborous tasks involved and takes a person with physical strength to move 300 pound drums or operate forklifts or lift 50 pound bags and things of this nature, so they have to have the physical qualifications to perform the jobs.

Q You don't have any absolute physical requirements in terms of weight or size or sex?

A No sir.

Q Is this a judgment call on the part of the people who are making the decisions?

A Based on experience we know that a very tall and skinny person is going to have a time with drums and we know that a really short stocky person might a difficult time raising heavy boxes and it would cause back strain and things like this. So it is just from experience.

Q And you don't give them a medical examination and a physical test to see if they can lift something?

A No.

Q All right. What else beside physical qualifications do you require of a chemical operator?

A They have to have a mental ability to be able to perform the tasks that are required, that are more complex, due to the technical nature of our plant, and because of the number of jobs they would be operating. And this you try to some extent to evaluate in an interview, and you can gather this from the past duties they performed on the job to some extent.

Q Just the past duties they have had in other jobs, is that what you said, is the way you determine mental ability?

A Well, from conversations and just an interviewing technique you try to determine if the person seems to have an aptitude that they could perform the functions.

Q Does their formal education count for anything in that evaluation?

A That's difficult to say because a person with a sixth grade education—we have evaluated scores of the chemical operator trainees, and a person with a sixth grade education might make more than somebody with two years of college, so it is difficult to look at the educational background and try to determine if they are going to make good or bad on it. So that's why we don't require a high school education.

Q But you are not using the aptitude test anymore?

A That's right.

Q So it is just the interviewer's opinion based on a conversation?

A Yes sir.

Q Besides the physical and mental abilities do you have any other kinds of qualifications that you can tell us about?

A We would like the person to have a background that would indicate the person would be a stable, dependable employee, and one that would be with us a long time, because it takes quite a period of time to train this individual and we try to make this determination, if the person is going to be with us and be satisfied with a job over an extended period of time.

Q How do you make decisions or conclusions about the stability of the person's background? Tell us how that is done.

A We try to look at their employment history to determine how many jobs they had had in the past years; if they had any length of time that is unaccounted for, that you are not sure what the person did during that period of time. But their past experience is a good

■ Appellants claim that the Union Carbide hiring practices were discriminatory and violative of the Civil Rights Act, Title VII. Nevertheless, the employment practices of Union Carbide appear to be fair in form—that is, reasonably directed to secure the best qualified candidate for the position available. Although perhaps fair in form, the hiring and promotional practices must also be fair in operation. In *Rowe v. General Motors Corp.,* 457 F.2d 348, 355 (5th Cir. 1972), Chief Judge Brown stated:

> "It is clearly not enough under Title VII that the procedures utilized by employers are fair in form. These procedures must in fact be fair in operation. Likewise, the intent of employers who utilize such discriminatory procedures is not controlling since 'Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation.' *Griggs v. Duke Power Co., supra,* 401 U.S. [424] at 432, 91 S.Ct. [849] at 854, 28 L.Ed.2d [158] at 165.

> "It is therefore clear that employment practices which operate to discriminate against people because of their race, color, religion, sex or national origin, violate Title VII, even though the practices are fair on their face and even though the employer had no subjective intention to discriminate."

An examination of the consequences of Union Carbide's employment practices is thus critical to a disposition of this case.

The litigants proposed separate methods to analyze the hiring data. The appellants suggested that the total number of applications filed by black persons is the critical factor to be considered. Their statistical analysis showed that blacks filed approximately 50% of all applications but secured only 26% of new hourly positions:

indication, I believe, of what they will do in the future.

Q * * * [Y]ou did say you have no strict educational minimums such as a high school diploma?

A That's correct.

Q Do you have any age minimum?

A Minimum? Well, because of the number of applicants we have who we can get that are mature people we don't hire very many people now around the age of 19. We prefer older people if we can find the people in our active files at that time that are older, more mature people that appear more safety conscious on the job.

Q 19 years, as a general rule, is the cut off?

A I guess you could make that general statement.

* * * * * *

Q Are there any particular kind of prior experience that the company favors towards applicants for chemical operator?

A Well, of course, if I can find somebody with chemical operator experience—that's great. If you can find someone with industrial experience, someone that's been on the job several years, shown stability—that's good. But if you find a person that has been working with a service station or with a carpenter or with someone for a good number of years that showed stability you would consider these people also.

Q Mr. Garner, why is prior industrial experience considered a desirable qualification?

A Well, I guess about the same reason prior legal experience would be good for an attorney. It would require less training for that person who probably knows already what the job entails, and a clerical type person might get on the job and after six months say, "The job is not for me, it is too hard." So a person with industrial experience knows what the job calls for.

Q * * * [W]hat about the factor of getting along with people well? Is that an important qualification for people applying at Carbide?

A Yes sir. Very important.

Q And how do you judge whether or not people get along well when they come through your hiring process?

A Sometimes not very well. We will, of course, check references from previous employers. That's the best way to tell. Or if they know of people in the plant we can ask that person in their opinion what kind of record this person had, if they know them. We try to check references.

| Year | Hirees | | Applicants | |
|---|---|---|---|---|
| | Black | White | Black | White |
| 1971 | 10 | 7 | 572 | 587 |
| 1972 | 25 | 48 | 1177 | 1071 |
| 1973 | 19 | 68 | 1114 | 1018 |
| Total | 54 | 123 | 2863 | 2676 |

At least one witness, however, cast suspicion on the reliability of appellants' approach, comparing it to "trying to measure jellyfish with a rubber band [because] you don't know where all the applicants come from . . . [and] how many are duplicated. [S]ome applicants fill six applications a year out. We have even had three or four in one month from a particular applicant."

Union Carbide, offering an alternative method of analysis, urged that the employment record should be proportionate to the composition of the local work force. Since 1970 approximately 33% of all employees hired by Union Carbide have been black. Operating its plant in an area where the labor force is approximately 26% black, Union Carbide presents convincing statistics tending to negate the existence of a discriminatory effect of its hiring practices and procedures:

| Year | Hirees | | % Black |
|---|---|---|---|
| | Blacks | Whites | |
| 1965–1969 | 37 | 166 | 18% |
| 1970 | 5 | 9 | 35% |
| 1971 | 10 | 7 | 58% |
| 1972 | 25 | 48 | 34% |
| 1973 | 19 | 68 | 21% |
| Total | 96 | 298 | 24% |

■ Adopting Union Carbide's method of analysis, the district court concluded that the employer " . . . has truly equal access to jobs at its Chickasaw plant by blacks and whites and the Court finds that this has in fact produced an employee population with substantially the same proportion of blacks represented as are in the Mobile area work force." The district court's recognition of the employer's method of analysis as more reliable and indicative of racial discrimination is supported by testimony that appellants' alternative analysis is subject to suspect data, such as the duplication of employment applications. Additionally, the trial court's finding that Union Carbide's method is more reliable is supported by the practice of other federal courts. On many occasions federal courts have compared the composition of the company's work force to the composition of the labor force in the surrounding area. *E. g.,*

*Jones v. Tri-County Elec. Cooperative, Inc.,* 512 F.2d 1 (5th Cir. 1975); *Morrow v. Crisler,* 479 F.2d 960 (5th Cir. 1973), *rehearing,* 491 F.2d 1053, *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); *NAACP v. Beecher,* 371 F.Supp. 507, 515 (D.Mass.Mod.) *aff'd* 504 F.2d 1017 (1st Cir. 1974), *cert denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775; *Crockett v. Green,* 388 F.Supp. 912, 917 (E.D.Wis.1975); *Fowler v. Schwartzwalder,* 351 F.Supp. 721 (D.Minn. 1972).

■ Under the standard of review in this circuit there must be "requisite subsidiary facts to undergird the ultimate facts." *Causey v. Ford Motor Co.,* 516 F.2d 416, 420–21 (5th Cir. 1975). We conclude that the record presents sufficient underpinnings to support the ultimate finding that Union Carbide did not engage in discriminatory hiring practices.

## 2. *Promotional Practices*

Even an employer who exhibits nondiscriminatory hiring practices can fall short in its system of promotion, *Rowe v. General Motors Corp.*, 457 F.2d 348, 355–59 (5th Cir. 1972) (Brown, C. J.), and that appears to be the situation in the instant case. Although the employer's affirmative action hiring program has resulted in the employment of blacks in close proportion to the composition of the area labor force, the system of promotion has failed to provide equal access to the most preferred positions at the Chickasaw plant. For this reason we REVERSE and REMAND on the issue of Union Carbide's promotional practices.

(a) *System of promotion.* The plant uses a seniority system to promote employees within the rank of "hourly personnel." When there is an hourly position available, current employees can bid for the job. The senior employee satisfying the minimum qualifications for the position will secure the job. According to Mr. Garner, "[the plant] can't hire anybody outside the plant who makes a high test score or promote a person to that job who makes a higher test score . . . . [W]e promote the most senior qualified employees." Job candidates demonstrate that they are *qualified* by passing the examinations prepared and administered by the Employee Relations Manager and a plant foreman or supervisor.[6] The plant provides training programs designed to prepare employees for the exams, the passing of which is essential to secure a better hourly wage position. Thus, assuming the requisite seniority, completion of a training program and passing the company's exam are the keys to advancement within the hourly ranks.

In the case of "non-exempt salaried personnel"[7] the system of promotion is somewhat different. The personnel department posts a notice of the particular job opening and accepts applications for the position. After the initial screening process, applicants are referred to the department supervisor under whose direction the selected applicant would work. The ultimate employment decision is made by the responsible department supervisor, with personnel's concurrence.

A third category, "exempt salaried employees,"[8] is not derived from job posting or seniority bidding, but is the product of Carbide recruitment. Chemical engineers and other technical and supervisory personnel, for example, are exempt salaried employees. To fill the engineering positions Carbide representatives approach the colleges and universities to conduct job interviews. When the plant hires new foremen, the superintendents and supervisors evaluate all employees in the particular division and select the most qualified individuals for advancement from the hourly wage to salaried positions. The ultimate decision, however, is not based on uniform procedures or objective standards. Instead, the selection of one candidate over another depends on highly subjective criteria which shift in importance from case to case.

(b) *Statistical evidence of racial discrimination.* As mentioned earlier, the original work force at the Chickasaw plant was composed of 35 whites and 1 black. Six of the 35 whites are presently employed by Union Carbide: one is plant manager, one is an area supervisor, two are first line supervisors, and two are group leaders. Only the plant manager began his employment in that capacity; the other five white Carbide employees began in low priority wage-earning positions but were promoted through successive promotions. In contract, the first black employee began as an oiler and is currently a warehouseman; both jobs are low priority wage-earning positions.

Blacks continue to dominate the ranks of menial employment at Union Carbide's

---

**6.** The qualification test must be "job related" or designed to reliably predict whether the applicant possesses the reasonably necessary job skills. *United States v. Georgia Power Co.,* 474 F.2d 906 (5th Cir. 1973).

**7.** See n. 3.

**8.** See n. 3.

**660**

plant in grossly disproportionate numbers. For example, 40% of the oiler and helper-trade employees are black; blacks constitute only 19.2% of the total work force. Only 7.1% of the plant's maintenance department is black, exclusive of members of the oiler/helper trades.

The following charts demonstrate that blacks occupy a severely disproportionate number of the low-priority, non-salaried positions:

| | Starting Hourly Wage | White | Black | Total | % Black of Total |
|---|---|---|---|---|---|
| MAINTENANCE | | | | | |
| Group Leader Maintenance | $4.97 | 3 | 0 | 3 | 0% |
| Group Leader Electrical | $4.97 | 1 | 0 | 1 | 0% |
| Electrician "A"/ Maint. Mach. | $4.61 | 16 | 2 | 18 | 11.1% |
| Utility Maint. Man-Electrician "C" | $3.79 | 4 | 0 | 4 | 0% |
| Oiler | $3.63 | 0 | 3 | 3 | 100% |
| Helper-Trades | $3.46 | 9 | 3 | 12 | 25% |
| Maintenance Mech.Trainee | $3.58 | 2 | 0 | 2 | 0% |
| Sub Total | | 35 | 8 | 43 | 18.6% |
| PRODUCTION | | | | | |
| Senior Chemical Operator | $4.36 | 12 | 0 | 12 | 0% |
| Chemical Operator | $4.02 | 75 | 34 | 109 | 31.2% |
| Chemical Operator Trainee | $3.58 | 3 | 2 | 5 | 40% |
| Sub Total | | 90 | 36 | 126 | 28.5% |
| WAREHOUSE | | | | | |
| Warehouseman | $4.16 | 3 | 2 | 5 | 40% |
| Grand Total | | 128 | 46 | 174 | 26.4% |

| | July '65 | | | July '70 | | | July '72 | | | April 1973 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black | % Black of Total | White | Black | %Black of Total | White | Black | %Black of Total | White | Black | %Black of Total |
| PRODUCTION | 18 | 0 | 0% | 71 | 20 | 21.9% | 67 | 26 | 27.9% | 90 | 36 | 28.6% |
| MAINTENANCE | 6 | 1 | 14% | 23 | 7 | 23% | 24 | 11 | 31.4% | 35 | 8 | 18.6% |
| WAREHOUSE | 0 | 0 | – | 3 | 2 | 40% | 3 | 1 | 25% | 3 | 2 | 40% |
| SERVICE | 11 | 0 | 0% | 92 | 9 | 8.9% | 105 | 12 | 10.2% | 115 | 12 | 9.4% |
| TOTAL: | 35 | 1 | 2.7% | 189 | 38 | 16.7% | 197 | 52 | 20.8% | 243 | 58 | 19.2% |

A substantial disparity between the proportion of blacks in a specific job classification is sufficient to establish a prima facie case of employment discrimination. *E. g., Sagers v. Yellow Freight System, Inc.,* 529 F.2d 721, 729–30 (5th Cir. 1976); *Wade v. Missis-*

*sippi Cooperative Extension Service*, 528 F.2d 508, 516–18 (5th Cir. 1976); *United States v. T. I. M. E.–D. C., Inc.*, 517 F.2d 299, 311–14 (5th Cir. 1975); *cert. granted*, —— U.S. ——, 96 S.Ct. 2200, 48 L.Ed.2d 814 (1976); *Rowe v. General Motors Corp.*, 457 F.2d 348, 358 (5th Cir. 1972). The contrast between the black population of the Mobile area (approximately 28%) and the percentage of blacks in supervisory or salaried positions (below 10%) constitutes a substantial statistical discrepancy and, thus, establishes a prima facie case of unlawful racial discrimination. After the prima facie case is established, the burden of persuasion shifts to the corporation whereby it must show the statistical discrepancy results from causes other than racial discrimination. *Sagers v. Yellow Freight System, Inc., supra; Wade v. Mississippi Cooperative Extension Service, supra.*

(c) *Response to a prima facie case of discrimination.* Union Carbide contends that the employment statistics are the result of a nondiscriminatory system of promotion. For promotion within the hourly wage category, the employer relies on ostensibly nondiscriminatory data—the candidates' seniority and the successful completion of comprehensive tests designed and administered by the employer. In this employment category, we conclude that the district court's no-discrimination finding has inadequate factual underpinning in the record and should be REVERSED.

Union Carbide failed to establish that the qualification exams were "job related;" that is, there must be a correlation between test scores and actual job performance. *Crockett v. Green*, 388 F.Supp. 912, 919–20 (E.D.Wis.1975). Additionally, the employer failed to show that the admission standards for its training program were objective and nondiscriminatory. Because the training programs are a springboard to occupational advancement, the admission standards are clearly relevant to an analysis of the plant's promotional practices.

Promotion within the ranks of salaried personnel is based upon the supervisors' subjective evaluation of a job candidate, without definite qualification factors being considered in a fixed ratio. Mr. Garner described the basic process for promoting an hourly wage earner to a salaried supervisory position:

Q Mr. Garner, would you please describe the process of selecting first line maintenance and production supervisors?

A When there is a vacancy, an increased need for a first line supervisor in production, the positions are first approved by top management, who in this case would be the Plant Manager . . .. [Then the responsible Production Superintendent requests] his Area Supervisor to evaluate our employees for this position.

And the Area Foremen send out memos, or by any means, ask Foremen and Employee Relations Departments, Superintendents and general management to recommend anyone they feel would be qualified for the position. Evaluations are made . . . [by] anyone who had the opportunity to evaluate their performance in a Temporary Foreman's job or in a work capacity that they were being considered for.

These evaluations and reports are turned in to the Production Superintendent and in group meetings, we discuss applicants—applicants meaning from within the company at this time, we used to go outside—and a group decision is reached on who would be the best candidate for the position. At times, depending on the circumstances, we might choose to have a period of time of several months to try out Temporary Foremen who have not tried out before; or it might be the case that we have already have done this as the year went along and that might not be necessary.

But, after the *compilation of all of the results of the questionnaires or comments and evaluations,* then a group decision is made of who is going to be offered that job. That person is then interviewed, it could be by more than one person, by four managers—myself, the Plant Manager, the Engineering and Construction Manager and Mr. Portzer, our Production Manager. And if all agree that that is

the right person for the right job at that time, an offer is made to that individual.

Q Then the final decision is made by no one particular person?

A That is correct.

■ The questionnaires and evaluation forms used by Union Carbide require the interviewer's subjective opinion concerning the candidates' "adaptability," "bearing, demeanor, manner," "verbal expression," "appearance," "maturity," "drive," and "social behavior." Such high-level subjectivity subjects the ultimate promotion decision to the intolerable occurrence of conscious or unconscious prejudice. *Rowe v. General Motors Corp., supra,* at 358–59; *Wade v. Mississippi Cooperative Extension Service, supra,* at 517–18.

(d) *Conclusion.* In *Wade,* this court noted that the employer's employee evaluation form was constitutionally defective under *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) in three respects:

(1) "the questions on the evaluation form were in part subjective and vulnerable to either conscious or unconscious discrimination by the evaluating supervisors;"

(2) "the evaluation scores themselves were not consistently used as a basis for . . . promotion;" and,

(3) "the defendants wholly failed to make a showing that the test was substantially related to the particular job of the individual being evaluated." 528 F.2d 508, 518.

Similarly, in *Rowe* this court suggested several other conditions reflecting Title VII violations:

(1) "[t]he foreman's recommendation is the indispensable single most important factor in the promotion process, [but he is] given no written instructions pertaining to the qualifications necessary for promotion;"

(2) "standards which were determined to be controlling are vague and subjective;"

(3) "[h]ourly employees are not notified of promotion opportunities nor are they notified of the qualifications necessary to get the job;" and,

(4) "there are no safeguards in the procedure designed to avert discriminatory practices." 457 F.2d 348, 358–59.

■ In regard to Union Carbide's promotion practices in the ranks of salaried personnel, we also conclude that the trial court's no discrimination finding lacked adequate factual support in the record. Therefore, under our standard of review, we REVERSE and REMAND the district court's findings and conclusions regarding Union Carbide's system of promoting employees in the ranks of the hourly wage and salaried personnel. *Causey v. Ford Motor Co.,* 516 F.2d 416, 420–21 (5th Cir. 1975). The employer clearly failed to rebut the statistics or to explain the disparity in promotion.

## CLASS ACTION CLAIM

Appellants argue that the trial court's "opt-in" notice violates the "opt-out" notice provisions of Rule 23(c)(2).[9] Indeed, Rule 23(c)(2) provides for mandatory notice to (b)(3)-type[10] class members whereby each has a right to exclude himself, or opt out of

9. Rule 23(c)(2) provides:
 In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request

exclusion may, if he desires, enter an appearance through his counsel.
Fed.R.Civ.P. 23(c)(2).

10. Rule 23(b)(3) provides:
 An action may be maintained as a class action if . . . the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudi-

the class. Concerning this opt out option under Rule 23(c)(2), one commentator pointed out that the provision was patterned after the highly successful procedure of the Book-of-the-Month Club. Frankel, "Some Preliminary Observations Concerning Civil Rule 23," 43 F.R.D. 39, 44 (1967). The rule was designed to prevent "sideline sitting" and subsequent "one-way intervention" by the eligible class member. *Compare, Escott v. Barchris Const. Corp.,* 340 F.2d 731, 735–36 (2nd Cir. 1965) (Friendly, J., concurring).

 Appellants' claim essentially contests the second portion of the district court's "Notice of Pendency of Class Action" requiring class members to opt in to obtain back pay.[11] The supplemental notice to class members that do not opt out under the first portion of the Notice is permissible as requiring "some affirmative action as a condition of ultimate recovery." 3B

> cation of the controversy. The matters pertinent to the findings include:
>> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
>
> Fed.R.Civ.P. 23(b)(3).

11. The first portion of the district court's notice of January 7, 1974 provides:
> You are hereby notified that Freddie D. Robinson and others have pending a legal action in the United States District Court for the Southern District of Alabama on behalf of all black job applicants and black employees of Union Carbide Corporation, Materials Systems Division . . .
>
> The Court has by Order found and determined that this action is to be maintained as a class action for the benefit of the class.
>
> The basis of liability claimed against the defendant is the alleged violations of federal fair employment laws.
>
> The defendant has denied liability.
>
> If you are black and are either an employee or have been an employee or have an outstanding job application with the defendant, Union Carbide Corporation, Materials Systems Division, you will be included in such class for injunctive relief purposes; it is not necessary for you to contact the Court per-

Moore's Federal Practice ¶ 23.55 at 23–1161 (1975); *Iowa v. Union Asphalt & Roadoils, Inc.,* 281 F.Supp. 391, 404 (S.D.Iowa 1968); *Philadelphia Elec. Co. v. Anaconda Am. Brass Co.,* 43 F.R.D. 452, 459 (E.D.Pa.1968); *Harris v. Jones,* 41 F.R.D. 70, 74–75 (D.Utah 1966).

Thus, assuming the sufficiency of the first section of the Notice, the district court did not err by requiring the affirmative action in the second section as a condition of ultimate recovery.

We AFFIRM this part of the district court's judgment.

## CONCLUSION

We AFFIRM the district court on the class action and hiring practices issues; REVERSE and REMAND on the no discrimination findings as to Union Carbide's system of promotion.

> taining to injunctive relief sought and any judgment will be binding upon you; however, if you wish to participate in this part of the litigation you have a right so to do and if you so elect you must notify the Clerk of the Court of your election by <u>February 20th, 1974</u>.
>
> The supplemental provision provides:
>> If you are black and an employee or have an outstanding job application with defendant, Union Carbide Corporation, Materials Systems Division, and desire other appropriate relief in addition to the injunctive relief, you must notify the undersigned in writing at Post Office Box 1964, Mobile, Alabama, 36601, or at the United States Court House, Clerk's Office, Mobile, Alabama, and said notice to be postmarked or filed not later than <u>February 20th,</u> 1974. If you desire to be included in the class for any such other appropriate relief and notify the undersigned or the Court of the same, you will be notified when the case is set on the merits, at which time you must appear and prove your claim in accordance with the law and be prepared to prove what efforts you have taken to mitigate your damages, if any.
>>
>> A hearing is scheduled for 9:00 a. m. on <u>February 15th,</u> 1974 in Room 229, United States Court House, Mobile, Alabama to which you are invited to attend and at which meeting you may ask questions and receive answers as to your rights and responsibilities. As you will note, this meeting is scheduled prior to the time you must make your election.