Jasper NEELY et al., Plaintiffs,

v.

The CITY OF GRENADA et al., Defendants.

No. WC 74–33–K.

United States District Court, N. D. Mississippi, W. D.

Aug. 26, 1977.

John L. Walker, Jackson, Miss., Ural B. Adams, Jr., Memphis, Tenn., for plaintiffs.

Henry T. Arrington, New Orleans, La., Phil Embry, Grenada, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

On January 30, 1974, plaintiffs Jasper Neely, Joe Durr and Annie Louise Blackman filed this class action alleging racial discrimination in all facets of employment by the City of Grenada, Mississippi, and its several divisions and departments, in violation of Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and 42 U.S.C. § 2000e et seq., 42 U.S.C. §§ 1981 and 1983, and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1242. Jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1343(3) and (4).[1] Defendants are the City of Grenada (City), its Police, Fire, Water, Street and Sanitation, and Planning and Community Development Departments; its Park Commission (formerly Recreation Department); Mayor J. D. Quinn; City Manager Francis W. Criss; former City Manager J. McEachin; City Councilmen Willie P. Allen, Robert Ratliff, George Murray, Harold Strider, Gail Jones and E. C. Neely; Superintendent of the Water Department J. T. Turner; former Superintendent of the Water Department George Wood; Superintendent of the Street and Sanitation Department Ben Sanders; Director of the Planning and Development Department Leon Kotecki; City Clerk Albert Clarke; former City Clerk J. R. Horton; and Assistant Personnel Officer

---

1. By order of October 4, 1974, the court certified this cause to be maintainable as a class action on behalf of "all black residents of Grenada County, Mississippi, who have applied or may in the future apply for employment in any of the departments of the City of Grenada, and all blacks presently employed by the city in any of its departments."

Ann Turner. The current City officials named as defendants are sued both in their official and personal capacities; the defendants who were formerly in office are sued personally.[2]

After extensive discovery, the court granted plaintiffs' motion to bifurcate the trial, thus limiting the initial trial to the issue of racial discrimination vel non by the City in its employment practices. Should plaintiffs prevail at the initial hearing, individual class members' entitlement to back pay or other relief shall be determined in subsequent proceedings.

After evidentiary hearing on December 13, 1976, the court, upon finding that plaintiffs had shown a substantial likelihood of prevailing on the merits of the class claim, granted plaintiffs' post-trial motion for a preliminary injunction prohibiting defendants from hiring any persons as employees of the City (in positions other than laborer or janitor) without prior court approval.

The parties have submitted legal memoranda as well as proposed findings of fact and conclusions of law. The case is now ripe for final determination and we proceed to make findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P.

## I. BACKGROUND FACTS

### A. The City's Racial Composition and Governmental Organization.

The City has a population of approximately 10,000, 44% of whom are black. It is located in and is the county seat of Grenada County, which has a population of about 20,000, 44% of whom are black.

The City is operated under a council-manager form of government pursuant to a special charter. Elected officials are the six councilmen and the mayor, who acts as presiding officer at meetings of the council. The council employs a city manager, who is the chief administrative officer of the City.

The City is divided into six administrative departments, viz., Police, Fire, Water, Street and Sanitation, Planning and Development and the Park Commission (formerly the Recreation Department).

Under the municipal charter, the city manager has the sole authority to appoint directors of these departments, with the exception of the chief of the police, who is appointed directly by the city council. The charter also gives the city manager authority to hire and fire all employees of the City, again with the exception of personnel of the police department. The charter further provides, however, that the city manager may delegate this authority to the various department heads. In practice, the department heads are delegated such authority.

### B. Employment Policies and Practices in General.

Prior to commencement of this action, the City had no sound system of personnel management. There were no established minimum qualifications for entry into the various municipal employment positions; no uniform policy for evaluating and rating new employees; no system for notifying employees of job openings or vacancies into which they could request transfer or promotion; no uniform promotion and transfer procedure; and no uniform disciplinary procedure. Written applications for employment were required by the police department alone, and then only since 1969. Also, the police department was the only department ever to advertise any job vacancy in any newspaper or on any radio station, and this was on a very limited basis discussed in detail below. Recruitment of new employees was almost exclusively through word-of-mouth. Defendants maintained a single Equal Employment Opportunity poster which was located in the city clerk's office.

Prior to institution of this action, persons applying for employment in various departments and agencies of the City would go to the department in which they were seeking employment to apply for a job. Applications or requests for employment were made to the head of the department, who

2. Some named individual defendant officers no longer being in office, their successors are automatically substituted as parties defendant under Rule 25(d)(1), F.R.Civ.P.

exercised complete control over personnel matters within the department, subject only to the number of job positions funded in the budget approved by the city council.

After suit was filed, the City, in July 1974, adopted written personnel policies applicable to all city employees, and written job descriptions, which have not been professionally validated. The personnel policies created the position of personnel director to serve under the city manager. The personnel director is charged with recruitment and maintaining records of all job applicants.

The recruitment policy provides that department heads shall notify the personnel director of the need for additional or replacement personnel by submitting a "Request For Personnel." After receipt of such request, the personnel director determines whether the position can best be filled by promotion from within the requesting department, transfer of other employees, or recruitment of new employees.

The factors which the policy lists as determinative of promotions are "efficiency of service, promise of continued employment, education and background, length of service and competitive examination." The ultimate decision as to which employees are qualified for a promotion and as to which of them shall receive a promotion rests solely with the department heads, who are not accountable to the city council for such decisions. The sole requirement stated for transfer is "minimum qualifications", and an employee seeking a transfer must make a request "on forms furnished by the city."

If promotion or transfer is not utilized to fill a vacancy, the position is to be filled by recruitment of a new employee.

Other than the above statements, the policy provides no detailed procedures to be followed in recruitment, except for certain instances where the personnel director is automatically to reject an application, e. g., where "application indicated on its face that the applicant does not possess the minimum qualifications required for the particular position," where "[t]he applicant has made false statements or fraud in his appli-cation," and where "[t]he applicant has been a former employee and was dismissed for cause."

The personnel policies also established a probationary period of six months for new employees hired as prospective permanent employees. The probation policy provides that during the probationary period, an employee may be terminated by his department head only after the department head has evaluated the employee's work performance, recorded such evaluation on the "Probationary Employee's Report," and discussed the report with the employee. Evaluation reports are required to be filed with the "personnel department" and made a part of the employee's file. At least two evaluations must be made before a probationary employee may be discharged, and such employees may not be terminated prior to the evaluation required at the end of the second month of the probationary period.

After a probationary employee satisfactorily completes the six-month period, he achieves the status of a permanent appointment. As such, he "may be terminated or transferred for incapacity only by the City Manager upon the recommendation of the department head."

Department heads are charged with the responsibility of preparing employee evaluation reports on permanent appointments as well as probationary appointments, although no time period is specified for preparation of such evaluations on permanent employees. In their employee performance reports "the department head shall evaluate the employee's work performance to ascertain the employee's ability to continue working on his job and to assist the department head with his duties of improving the work quality of his subordinates of [sic] fostering and maintaining good morale among his employees."

The personnel policies also provide a list of causes for separation of employees, including "employee misconduct;" failure of probationary employee to meet the standard required for continuous employment,

and failure to report for work for a period of three work days without reasonable excuse, with what constitutes a reasonable excuse to be determined by the department head. Separated employees may be reinstated to fill a vacancy "[i]f it is in the best interest of the city."

Employees may be suspended "in the interests of good discipline." A suspended employee is to be furnished a written statement of reasons for the suspension. The personnel policy provides employees a grievance procedure which culminates with appeal to the city manager.

The policies also contain a prohibition against employment of a person within a department in which his blood relatives are employed. No such prohibition, however, applies to employment of relatives in different departments.[3]

Copies of the written personnel policies, as well as copies of the City's job descriptions, are not readily available to municipal employees; they are maintained in the offices of the department heads and "personnel assistant" only. The "personnel assistant" is the city manager's secretary, and she performs the duties of the "personnel director" as set forth in the written personnel policies; the City has never hired a personnel director as such.

Despite the inclusion of the promotion and transfer policies in the City's written personnel policies adopted in July 1974, the "forms furnished by the city" on which municipal employees must make requests for transfers do not exist and at least as late as October 1, 1975, there was no formal procedure whereby city employees were notified of new job openings or vacancies in existing jobs into which they could request transfer or promotion. The City has since 1973 utilized a centralized job application procedure. Under this procedure, persons seeking employment by the City file written application with the personnel assistant in the office of the city manager, which is located in the city hall. After such application is obtained from the personnel assistant, filled out by the applicant, and filed with the personnel assistant, the assistant determines in which department a job is sought, and she files applications in chronological order in a folder which is maintained for each department.

The procedure followed by the personnel assistant, after notification by a department head of a vacancy, has differed for the original personnel assistant, Ann Turner, who served from September 1973 to October 1975, and the present personnel assistant, Sandra Harpole. Turner would pull the appropriate department file and contact those persons with the earliest date of application to arrange interviews with the department head. Harpole, however, forwards the department application file to the department head, who is to contact the applicants with the earliest application on file. The personnel assistant has no further duties or authority in the hiring process.

In January 1975, the City adopted a procedure whereby applications for employment are valid for 90 days only. If an applicant is not hired within 90 days of his application, he personally must go to city hall and fill out a new application; a simple notice of continuing interest in employment will not suffice. The only notice of the City's 90-day rule was publication of a legal notice in the Grenada County Weekly, a newspaper of limited circulation among blacks. A more widely circulated newspaper, the Grenada Daily Sentinel Star, was available to the City for publication of the notice, yet the 90-day rule was not advertised in that daily newspaper. Those currently making applications must rely upon the person taking their application to advise them of this policy as they are given no written notice to this effect; the 90-day procedure is not contained in the City's written personnel policies. Applications which are not renewed at the end of the 90-day period are placed in an inactive status.

3. Numerous other provisions are included in the personnel policies, but those set out above are the only policies directly relevant to this action.

It is the City's unwritten policy not to advertise job openings if active applications for such positions are on file when openings occur. No municipal department has ever engaged in any affirmative action program to increase the number of its black employees, nor has any department actively sought or recruited black prospective employees from Grenada's city and county public schools or traditionally black Mississippi colleges and universities. Department heads have generally not contacted black community leaders for assistance in locating qualified blacks to fill job vacancies.

The Grenada Chapter of the NAACP has petitioned the city council on at least two occasions requesting that the City adopt certain employment practices to alleviate what the NAACP perceived as racial discrimination in employment by the City. In July 1973, the NAACP proposed, inter alia, that qualifications for all municipal employment positions be posted in each department and on the city bulletin board, and that advertisements for all such job vacancies be placed in the local news media. Again, in March 1975, the NAACP proposed that all city employees be furnished with the personnel policies applicable to their departments. No action was taken by the council on these proposals.

Defendant Willie P. Allen, until recently the only black member of the city council,[4] has made efforts through various proposals at council meetings to eliminate what he feels are racially discriminatory employment practices by the City. His motions to such effect either have died for lack of a second or have been been tabled.

## II.  FACTUAL ASPECTS OF RACIAL DISCRIMINATION

### A.  Statistical Characteristics of City Employment in General.

Prior to 1968, blacks employed by the City in nonjanitorial positions were employed only as laborers in the street and sanitation department and the water department. On January 1, 1970, there were 55 persons in city employment, 31 of whom, or 56%, were black; two blacks were employed as police patrolmen and one black was employed as a driver in the street and sanitation department, with the remainder, or 94%, occupying laborer or janitorial positions. No whites were employed as laborers or janitors.

By January 1, 1972, the City had 105 employees, 41 of whom, or 39%, were black. Three blacks served as police patrolmen, two blacks were school crossing guards, and one black was employed as a driver in the street and sanitation department. The other 35 black employees, or 86% of all black employees, were employed as laborers or janitors; no whites were so employed.

On January 1, 1974, after plaintiffs Neely and Durr had filed EEOC discrimination charges against the City, and the EEOC had made its investigation, the City's work force consisted of 107 employees, 53 of whom, roughly 50%, were black. Black employment consisted of: one black fireman; three black patrolmen; two black school crossing guards; one black pumper in the water department; and 31 black laborers or janitors. Laborer/janitor employment of blacks thus accounted for 69% of total black employment. Again, no whites were employed in laborer/janitor positions.

By January 1975, a year after commencement of this action, there were 129 city employees, 54 of whom, or 42%, were black. At that time, there were five blacks employed as firemen, four blacks employed as patrolmen, two blacks employed as crossing guards, one black employed as a pumper, five black truck drivers, one black clerk-typist, a black "housing rehabilitation officer" (discussed in detail below), and 34 black laborers or janitors. Laborer/janitor employment was 63% of all black employment. Two whites, 2.6% of the white work force, were employed as laborers.

No black has ever been employed as the head of any city department. The only blacks to hold above entry-level jobs wherein they supervised white employees are

4.  Plaintiff Jasper Neely was elected to the city council in August 1976.

George Herron, who was promoted in April 1976 to the position of Lieutenant in the Fire Department, and plaintiff Durr, who was promoted at the same time to the rank of Police Sergeant.

As to promotions generally, for the period January 1, 1970 to June 30, 1975, 39 city employees received promotions; of those receiving promotions, 5, or 16%, were black.

Since January 1, 1970, there have been 29 whites employed in the various departments of the city who were related or married to another white concurrently employed in one of the city departments. Of these 29 persons, 17 were employed within the same department as their relative or spouse, a practice prospectively terminated by the personnel policies adopted in July 1974. The remaining 12 such persons were employed in differing departments; this latter arrangement only is acceptable under the new personnel policies.

B. The Black Employment Experience Within The Various Municipal Departments.

(1) Police Department

Grenada's police department currently consists of 31 employees, including two black crossing guards, one black dispatcher, three black patrolmen, one black sergeant, and a black maid. Black non-janitorial employees thus compose approximately 23% of such work force.

In 1967 the police department employed its first black officer; since that time, only twelve blacks, including the above mentioned seven, have been employed as sworn officers. These figures take on added significance when viewed in light of the relatively high turnover rate in the police department. For example, between 1972 and 1977, total police employment increased from 25 to 31, yet during that interval of time the department employed 46 different persons. Furthermore, seven of the total twelve black sworn officers were hired between January 1973 and January 1977; from June 1970 to January 1973, no blacks, yet thirteen whites, were hired. Of the three black patrolmen and one black sergeant currently employed, the earliest date of hire is July 1973.

There have been numerous black applicants for police employment. For example, as of June 1975, more than 50 applications dating from February 1966 from blacks seeking police employment were on file with the City.

No black has ever been employed by the police department as chief, assistant chief, captain, detective, or secretary. Prior to April 1976, no black had been employed as dispatcher or sergeant; plaintiff Durr's promotion to sergeant on that date is the sole instance of promoting a black police officer within the department; also, it is the only time a black has served above the rank of patrolman.

The police department itself has no formal training programs for new patrolmen. Traditionally, veteran officers have provided instruction and assistance to rookies. Formal police training is available only from the Police Academy at Jackson; selection of those officers to attend the academy, however, is based on seniority.

C. H. Lovorn has served as chief of police since August 1969, except briefly from July 15, 1976 to November 8, 1976, during which time he resigned because of the city counsel's interference in personnel matters within his jurisdiction. Chief Lovorn controls the hiring, firing, promotion, and discipline within the police department. In 1972, General Rules and Regulations for the department were adopted; although they were not prepared by Lovorn, he alone has the authority to determine if such rules and regulations have been violated by the department employees. In addition to promulgating rules of conduct for police officers, the rules and regulations set out a "Service Rating System" which provides the chief of police a basis for rating police employees. Lovorn, however, does not utilize this rating system in operating the police department; instead, he uses his best judgment based upon his experience as a police chief.

Lovorn also relies on his personal judgment to guide him in hiring and promotion decisions. An applicant must meet two standards before the chief will consider him for employment: (1) he must be "capable of doing police work;" and (2) he must have "good moral character." Completion of high school is not a requirement. Moreover, Lovorn follows no set format for interviewing job applicants to determine if they meet his approval.

Similar standards apply to promotions, which are determined on the basis of "ability" and "performance", as perceived by Lovorn, along with seniority.

Chief Lovorn's personnel decisions led to the filing of a complaint with LEAA which charged the police department with racial discrimination in its employment practices contrary to LEAA guidelines. After investigation, LEAA, in July 1973, recommended affirmative action to close the gap between the percentage of black sworn officers ("5%") and the percentage of city-wide black population ("over 40%"). LEAA proposed that the department include a statement that the department "is an Equal Opportunity Employer" in all advertising of job openings, and that the department contact several black community organizations at least three weeks prior to initiation of the selection process for entry positions of patrolmen in order to provide notice that a vacancy existed and was about to be filled.

Lovorn, in fact, complied with these recommendations through 1973 only. The reason given for abandoning the recommended procedures after 1973 was that after 1973 the police department no longer received any LEAA funds.

During the period of compliance with the LEAA recommendations, the police department placed newspaper advertisements of job vacancies. These ads were published in the Grenada Daily Sentinel Star; two ads for a radio operator/dispatcher were placed in August 1973, and four ads for patrolmen were published, two in August 1973 and two in November 1973. As heretofore stated, these are the only occasions on which the City has ever utilized news media to publicize job vacancies.

When Lovorn reported to the LEAA in January 1974 that two out of five patrolmen hired during the reporting period were black, LEAA responded that the figures indicated that he was making progress, but cautioned that "there is still a very significant underrepresentation of minorities on the force, and the good faith efforts you have exhibited in the past should continue." As noted, however, the "good faith efforts" undertaken at LEAA's behest by that time already had ceased.

Experiences of members of the plaintiff class shed further light on the employment practices of the police department. James E. Harris, a 31 year-old black life-long resident of Grenada, on January 7, 1970, submitted an application for a patrolman position to Chief Lovorn. Harris was a high school graduate, and had completed three years of service in the United States Army as a military policeman and as an assistant platoon sergeant in Viet Nam. Lovorn told him there were no positions open, but that Harris would be contacted when a vacancy occurred. Approximately two and one-half months later, Harris noticed new patrolmen on the job, and again talked with Lovorn about employment. Lovorn gave the same response—that he would get in touch with Harris when a job became available. Harris subsequently obtained employment as a security officer at Mississippi Valley State College in Itta Bena, 42 miles from Grenada, in the hope that such employment would enhance his job opportunities with Grenada's police department. He did not, however, receive an offer from the police department.

On October 17, 1974, Harris did receive a letter from Grenada's "Personnel Department," signed by Ann Turner. The letter, in essence, stated that Harris' application was in the City's "active file," and inquired if he retained an interest in employment by the City. Spaces were provided to indicate either continuing interest in employment or lack thereof. The letter contained no notice of the City's 90–day renewal rule. Harris indicated in the space provided that

he was still interested in municipal employment and returned the letter by mail as directed. This was his last communication with the City.

Since the dates of Harris' application and affirmation of such application, numerous whites possessing no better objective qualifications than Harris have been employed as police patrolmen. Indeed, at least six whites for whom no applications are on file have been employed as patrolmen since the date of Harris' application. Three of these six were employed after adoption of the City's centralized application procedure, which obviously could not have been followed without the applicant completing and filing a written application. According to Lovorn, word-of-mouth advertising of job openings in the police department is still practiced; necessarily it must have been in the case of those post–1973 employees for whom no application is on file. The only reason assigned by Lovorn for his failure to hire Harris is that Harris was employed at Mississippi Valley State University.

Joe Brown is a 38 year-old black resident of Holcomb, a community located approximately 10 miles from Grenada. Brown is presently employed by Day Detective Agency as a security guard; his work requires the carrying of weapons on certain assignments. On November 13, 1973, Brown applied at city hall for employment as a police officer. After first encountering difficulty in obtaining an application form from Ann Turner, he received a form at the instruction of City Manager Criss. Upon completing the form, Ann Turner advised him that he would be notified when a job became available. Brown returned to city hall in December 1973 to make inquiry about his application, and Ann Turner told him his name "was way down the list." In March 1974, Brown approached Chief Lovorn, who gave him the same advice Brown had received at city hall—he would be contacted when a vacancy occurred. Brown subsequently talked with Lovorn several times, but to no avail. Later in 1974, he began working with Day Detective Agency.

On February 13, 1975, Brown went to city hall to talk with Criss in an effort to learn why no action had been taken on his employment application. Criss informed him of the implementation of the City's 90–day rule, and told Brown he needed to fill out a new application to be placed in the "active" file. Brown completed a new application, but was never subsequently contacted about police department employment. At the time of Brown's initial application, he had ten years of formal education. As mentioned earlier, there is no educational requirement for police officers, and at least six whites without high school diplomas have been hired as police officers. Brown thus appears to have been objectively qualified for employment by the police department. In fact, Lovorn did not challenge that Brown was competent to be a patrolman. Nevertheless, although several whites were hired after the date of Brown's application, he was never contacted.

Further insight into the lack of objectivity of hiring policies in the police department can be gained through the incident which led to Chief Lovorn's brief resignation. During April 1976, the department had a job opening for dispatcher. Lovorn was approached by two white city councilmen who told him that Ronnie Houston, a white male, had to be hired to fill the opening. In January 1976, Houston had first filed an application for police department employment and had renewed his application in March 1976. Upon checking the active application file for the department, Lovorn found that there were three active applications with dates of application preceding those of Houston. Houston got the job notwithstanding the earlier active applications, and Lovorn resigned shortly thereafter. This, according to the chief, was not the first time politics had entered into police personnel decisions. Nevertheless, Lovorn was reemployed as chief in November 1976, and still holds that position.

Chief Lovorn's requirement that department employees must have "good moral character" apparently was the basis for his rejection of Clyde Simmons for a patrolman position. Simmons is a 38 year-old black

male. He had been seeking employment as a police officer since February 1967, when he first applied for such employment with then-Chief of Police Pat Ray. In February 1968, he again applied with Lovorn's predecessor, Chief Paul McElroy. He never heard from Ray, and McElroy told him the same thing that James Harris and Joe Brown had heard in their efforts to obtain police employment—he would be notified when a vacancy occurred. Simmons reapplied with Chief Lovorn in September 1969, and made numerous subsequent contacts with Lovorn, but Lovorn always told him no jobs were available. Lovorn, however, admittedly rejected Simmons' application because of his criminal record, which consists of four misdemeanor convictions, three for gambling and one for drunkenness. Nevertheless, in 1973, Lovorn did employ Charles Outlaw, a white male, as a patrolman, knowing that Outlaw had been convicted of petty larceny.

### (2) Fire Department

Grenada's fire department currently employs 23 persons, 5 of whom, or approximately 22%, are black. The first black fireman was hired in August 1973—after EEOC charges of racial discrimination had been filed. Relatively large numbers of black citizens have applied for firefighter employment. For example, on June 30, 1975, the City had on file more than 35 such applications. Since the first black was employed, a total of 8 blacks have been hired. Of these 8, 6 were employed on the same date, July 1, 1974, or subsequent to commencement of this action. A total of 8 fireman vacancies were filled on July 1, 1974; of these 8 positions, 2 were vacancies in preexisting positions, and the other 6 were new openings necessitated by the imminent coverage of municipal employees under the wage and hour provision of the Fair Labor Standards Act, 29 U.S.C. §§ 206 and 207.[5]

Prior to adoption of the centralized application procedure in 1973, Fire Chief Bud Chapius maintained a file on job applicants in his department.

No black has ever held the position of chief, assistant chief, or captain in the fire department. No black fireman, other than George Herron, who was promoted to the rank of lieutenant in July 1976, has attained promotion or received a rank higher than fireman.

The fire department has no formal training procedure for new firemen. Instead, rookies are expected to learn how to perform their duties from veteran employees, just as in the police department. As in the police department, some outside training is available, but only one black fireman has been selected to participate in such training.

Chapius has been fire chief since 1964. He alone controls hiring, firing, promotion, and discipline within the department. Like his counterpart in the police department, Chief Chapius relies upon his best judgment in making personnel decisions within the department. The only qualifications that an applicant for fireman employment must possess are the physical ability to do the work and the ability to make simple arithmetic calculations. Because of the latter requirements, Chapius prefers that firemen have a high school education, yet this is not indispensable. Applicants are given no tests to determine their ability to perform either the job's physical requirements or the necessary mathematical computations. Indeed, Chapius follows no set format for interviewing applicants to determine their qualifications.

Eligibility for promotion is determined in the same manner as in the police department, i. e., Chapius decides whether an employee has sufficient ability and whether he has performed well enough to fill the slot open for promotion. In making those decisions, he sometimes seeks the opinion of an employee's captain, who is his working su-

---

**5.** Such coverage was subsequently held unconstitutional, *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245.

pervisor. If two or more employees have the same ability and performance record, as perceived by Chapius, the person with the greatest seniority gets the promotion.

Jerry Harris is a 26 year-old black male who has resided in Grenada since 1970. On September 23, 1972, Harris filed a written application for a fireman's job with Chief Chapius. The fire chief informed him that there were no job openings, but that he would be contacted when a vacancy did occur. Never having heard from Chapius, in early 1974 Harris again approached him about possible employment. Chapius reiterated that there were still no vacancies, but that Harris would be contacted when a vacancy occurred, stating there was no need for him to update his application.

In the course of the May 1973 EEOC investigation of the charges of discrimination filed by Neely and Durr, EEOC's investigator was furnished with a list of what purported to be all fire department job applicants. The following entry appeared on the list:

Jerry Harris    9/23/72    Will consider this application when opening comes. Application looks good.

Despite this entry, Harris has never been offered employment as a fireman, although at least six whites were so employed after the date of Harris' application. In fact, two of the white applicants were hired July 1, 1974, shortly after Harris had contacted Chapius about his continuing interest in fire department employment.

Lamar Blackmon, a 31 year-old black male, had experiences similar to those of Jerry Harris. Blackmon applied in writing for a fireman's job with Chapius on January 5, 1970. Blackmon, who had a seventh grade education, had been employed as a truck driver for a number of years. Chapius told him there were no vacancies, but that he would be notified when a vacancy arose. Blackmon has never been contacted by Chapius, but since the date of Blackmon's application, at least 12 white firemen have been newly hired. Of these 12, 7 had not filed written job applications. Moreover, 3 out of the 7 whites newly employed

were hired after adoption of the centralized application procedure. Apparently, the 3 whites hired without written application after adoption of the centralized application procedure were recruited by the fire department by means of the traditional word-of-mouth method of notification.

Jerry Weir, a 27 year-old black male, was hired as a fireman trainee on December 1, 1973, which was 3 months after the first black fireman was hired. While Weir was in training, white supervisory officers allowed white trainees to watch television, yet Weir was directed to clean up the department premises. Also, white trainees, but not Weir, were allowed to ride inside the fire truck on training drills and fire calls.

(3)  Water Department

Grenada's water department currently employs 20 persons—12 white and 8 black. The black work force consists of one black clerk-typist, one black pumper, and 6 black laborers. No black has ever been employed by the department as meter reader, foreman, assistant superintendent, or superintendent. P. M. Davis became the first black to occupy a position in the department other than laborer when in 1972 he was promoted to pumper. Davis, however, is the only black who has ever received a promotion within the department. Other blacks holding positions in the department, other than laborer, are Enard Moore, who was hired as a waste water treatment plant operator in April 1975, and who was employed less than a year, and Diane Spencer, who in 1975 was transferred to the water department (as a clerk-typist) from the municipal planning and development department.

There is no formal training program in the department whereby new employees are familiarized with their job responsibilities. This department, too, has provided white employees with outside courses at city expense to enable such employees to obtain higher paying jobs within the department. While attending training courses, such em-

ployees continued to receive their regular salaries. No black employees have received job training at city expense. In fact, the availability of such training has not been made known to black employees.

J. T. Turner served as superintendent of the water department from October 1972 to September 1975; the position is now vacant. As superintendent, Turner had sole authority over all personnel matters within his department. Turner also followed no set procedure for hiring prior to adoption of the centralized application process; word-of-mouth recruitment was utilized. After the centralized application procedure was adopted, Turner sometimes would call the Mississippi State Employment Service to refer applicants if there were no job applications on file with the personnel assistant. Turner also had no set qualifications that applicants had to satisfy; there were no educational qualifications for any position other than waste water treatment plant operator, which is regulated by state statute. Turner admitted that he did not rely on the City's job descriptions.

In March 1975, the water department placed a job order with the State Employment Service for a meter reader. Joe Brown, whose experiences with the police department have been chronicled above, was thereupon sent by the Employment Service to the office of personnel assistant Ann Turner, who was the wife of Superintendent Turner. Upon Brown's arrival, the personnel assistant called the water department and said that she was sending Brown over. About 45 minutes later, Brown went to the water department offices. He was met by Superintendent Turner, who told him that the only job openings available were for laborers, and that Turner could not understand why Brown was sent to the department for a meter reader vacancy. However, on March 24, 1975, Turner hired William Knight, white, as a meter reader.

Felix Freelon, a 25 year-old black male high school graduate, applied for employment in the water department by filing an application with Turner on September 17, 1973. Turner told him no jobs were availa-

ble at that time. Freelon heard nothing from the City until September 18, 1974, when he received a letter from Ann Turner like that received by James E. Harris in his quest for employment by the police department. The letter inquired as to Freelon's continuing interest in municipal employment, and provided spaces to indicate such interest or lack thereof. Like the letter Harris received, it omitted any reference to the City's 90-day reapplication rule. Freelon checked the space indicating continuing interest in employment, and mailed the letter back to Mrs. Turner. He never heard anything further from the water department. The proof shows, however, that 3 white persons were hired as meter readers and one white was hired as a pumper subsequent to the date of Freelon's initial application.

The employment experience of Willie Joe Hundley with the water department adds to an understanding of personnel practices within the department. Hundley, a 54 year-old black male, was employed as a laborer in the water department from January 1973 to April 1975. During his employment, Hundley's principal duty was to assist meter readers. In the course of his work, Hundley walked routes with various meter readers, opened meter boxes, and recorded meter readings. After Hundley gained experience, he continued to be a meter reader "helper", serving only as an assistant to both experienced and newly hired meter readers. In spite of his experience, Hundley was never offered employment as a meter reader, although 4 whites were hired as meter readers during the period of Hundley's water department employment.

The reason given by J. T. Turner for not promoting Hundley to meter reader was that his "work record didn't justify" it as Hundley had frequently been absent from work. The only absences shown in Hundley's personnel file, however, are a period of 6 hours on September 10, 1974, half a day on September 13, 1974, and 7 days for vacation in 1975. Hundley's personnel file contains no employee evaluation report as required by the City's 1974 personnel policies,

although the personnel folders of whites employed during the same period do include such reports. Turner concedes that he did not follow the City's personnel policies.

Hundley was fired in April 1975 by J. T. Turner for "dishonesty." The "dishonesty" involved the selling by Hundley of scrap copper pipe which Hundley's supervisor told him he could have. Inexplicably, Turner had acquiesced in employees other than Hundley taking the City's scrap copper—a valuable commodity—for their own purposes; Turner himself acknowleged that there was no department policy concerning scrap pipe. Moreover, Hundley voluntarily repaid the department the money he received for the scrap—the sum of $53. Hundley did not resort to the City's grievance procedure simply because he did not know it existed. Although Turner discharged Hundley for this "dishonesty," Turner subsequently requested Hundley to work for him personally, but Hundley refused.

(4) Street and Sanitation Department

Grenada's street and sanitation department is by far the largest single City department. It currently employs 43 persons: a white superintendent, 2 white equipment operators, a white mechanic, a white mechanic's helper, 5 white drivers, 6 black drivers, and 28 black laborers. All positions other than superintendent and assistant superintendent are compensated hourly. No black has ever been employed as mechanic, mechanic's helper, equipment operator, assistant superintendent, or superintendent. The department employed only 1 black driver until late 1971, when a second black was promoted to the position. In 1976 a black was hired directly into a driver position and a white laborer was promoted to driver. Prior to that time, all blacks who held jobs other than laborer were promoted into such jobs after first working as laborers, while whites were hired directly into positions above laborer.

The laborer positions in the street and sanitation department traditionally have been filled by blacks. Although many black laborers were able to drive and in fact did drive the department's trucks and equipment during the absence of regular drivers and operators; blacks so qualified have not been promoted into driver positions until recent years, and have not been promoted into operator positions at all.

Ben Sanders served as superintendent of the street and sanitation department from March 1970 to June 1976. The superintendent's position is also currently open. As superintendent, Sanders, like the other department heads, was completely in charge of personnel matters within his department. Hiring and promotions were completely subjective; hiring was by word-of-mouth prior to adoption of the centralized application procedure; and prospective applicants were not advised of job vacancies. Sanders resigned as superintendent in June 1976 because of pressure from the city council. He was, however, "transferred" into a newly created inspector position in the water department. At the time of his resignation, he was 18 months away from retirement.

(5) Planning and Community Development Department

The department of planning and development initially was established in June 1972 as the department of building inspectors, and was changed to its present form in October 1974. It is a small department having never employed more than 5 persons. In October 1974, Leon Kotecki was appointed department director by the city council, despite the fact that the city charter provided that the city manager "shall have exclusive power and shall be required to" appoint directors of all departments other than the police department.

Diane Spencer, the first black employed by the department, was hired in November 1974. She was subsequently transferred to the water department in October 1975. Tommy Harris, the only other black who ever worked in the department, is presently employed as a city police officer. After filing applications for patrolman and fireman positions in early 1975, Harris was employed in March of that year by the

planning and development department as "Housing Rehabilitation Officer." Upon assuming this position, however, Harris found that he had little more than a title. The only work he performed while so employed for several months was to make a survey of garbage receptacles, which consisted of riding in a garbage truck and counting the number of garbage barrels throughout the municipality. This task took approximately three weeks. From time to time he rolled change from parking meter collections in wrappers. During the balance of his employment, he had no duties; Kotecki suggested that he read books and newspapers.

### (6) Park Commission

The park commission was created in November 1975 as the recreation department. About a year later it was renamed the park commission. The commission is staffed by a director only, who hires young people to run summer recreation programs.

The park commission director is Wayne Carson, a white. He was hired December 1, 1975, like Kotecki in the planning and development department, by the city council. At the time of his hire, the application of Mose Eubanks dated November 13, 1975, and seeking employment in the recreation department, was on file. Eubanks, a 30 year-old black male, has a bachelor's degree in sociology; he had been employed as a deputy sheriff in Grenada County, as well as in other positions of responsibility which required him to be bonded. He was not contacted about any position with the recreation department.

The summer baseball program operated by the department in 1976 is indicative of the city government's commitment to racially neutral policies. The department originally set up three leagues—white boys, white girls, and black boys—by handing out color-coded cards at schools in Grenada County. After receiving protests from black citizens about the segregated leagues, the only action taken was creation of a black girls' league. There was no competition between teams across racial lines; the

white leagues played only on the field located in a predominantly white neighborhood, and the black leagues played only on the field located in a predominantly black neighborhood.

### (7) General and Administrative Department

The general and administrative department operates under the control of the city manager, assisted by the city clerk. In fact, the city clerk is in charge of most personnel decisions within this department, other than those concerning the city manager's secretary, who doubles as personnel assistant. Other than the 3 above named employees, the general and administrative department hires a tax collector, an accounting clerk, a secretary, and a keypunch operator. In October 1975, the department first employed a black, Linda McClain, as a keypunch operator. McClain and Diane Spencer continue to be the only black females who have been employed by the City in any department in positions other than maids.

City Manager Criss hired Albert Clarke as city clerk in June 1972. Clarke heard about the job through word-of-month. In a similar manner, Criss sought out Mrs. Turner to serve as his secretary and personnel assistant.

Mrs. Turner, hired in September 1973, has a high school education and attended business school. At the time she was hired, she had several years of secretarial and general office experience. Marguerite Golliday, a 28 year-old black female with a high school education and several years of secretarial experience, had filed an application for a "typist-clerical" position with the City on June 6, 1973. She was not contacted or interviewed by Criss about the secretary/personnel assistant opening; she was, however, contacted about an upcoming municipal job vacancy in July 1974, but by that time Golliday had secured other employment.

When Mrs. Turner resigned her position in October 1975, Criss promoted Clarke's secretary, Sandra Harpole, into Turner's

former position. No public announcement or advertising of the opening was made.

### C. The Named Plaintiffs

#### (1) Jasper Neely

Jasper Neely, a life-long resident of Grenada, is president of the Grenada Concerned Citizens Committee and the Grenada Chapter of the NAACP. Both individually and through the above organizations he has sought to eliminate what he regards as racial discrimination in employment practices of the various areas of city government. His actions have included writing letters to the city council, publishing communications in local newspapers, and from time to time conferring with various city officials.

Neely is a high school graduate; he also attended college briefly, and has taken several correspondence courses. He first sought municipal employment in 1964 by applying to then-Chief of Police Ray for a patrolman position. Ray informed him that if Neely were so employed, his law enforcement duties would be confined solely to black neighborhoods and black citizens. Neely responded that he would not consider police employment under such restrictive terms.

On September 21, 1972, Neely again applied in writing for a patrolman position to Chief Lovorn. On the same date he also applied for a fireman's position by written application filed with Chief Chapius. Neely got the same response from both men—that there were no jobs available, but that he would be contacted when a vacancy occurred. Subsequently, on September 25, 1972, Neely filed EEOC charges of class-wide racial discrimination against the City of Grenada, its mayor, councilmen, and several department heads.

After conducting an investigation into Neely's charges, the EEOC, on July 13, 1973, issued a letter of determination finding probable cause to believe that the City and its officers and agencies had engaged in unlawful, racially discriminatory employment practices. Thereafter, on November 1, 1973, the EEOC issued Neely a "right-to-sue" letter. The present action was timely filed on January 30, 1974.

During the course of the EEOC investigation, a list of applications for fire department employment was furnished to the EEOC investigator. The list included the following entry:

Jasper Neely    9/21/72    This man is lazy to work, wouldn't last if given a job.

In spite of the above entry, Neely was offered employment by Chief Chapius in March 1974; he accepted and began work on April 1, 1974. Between the date of Neely's application and his date of hire, 3 whites were newly hired as firemen. Neely was never offered employment as a patrolman, though he is fully qualified to hold such position. Seven white men were so employed between the date of his written application for such employment and the date he was employed by the fire department.

Neely served as a fireman from April 1974 to August 1976, at which time he resigned to run for a seat on the city council. During the course of his employment, Neely performed satisfactorily, never being subjected to disciplinary action. According to the evidence, no employee evaluation reports were prepared on Neely, and he was not offered a promotion during the period of more than two years of his service as a fireman. For the most part, Neely had no difficulty with his white co-workers during his tenure as a fireman. He did, however, on one occasion complain to Chief Chapius about use of the word "nigger" by some white fireman. Chapius responded that this was "freedom of speech," and refused to take any corrective action.

#### (2) Joe Durr

Joe Durr, like Jasper Neely, has taken an active role in black organizations in Grenada such as the NAACP and the Concerned Citizens Committee. He first applied for city employment in August 1970 by submitting an application for a patrolman position to Chief Lovorn. Durr was fully qualified

for such employment as he had 11 years of formal education, and 3 years of service in the United States Army, during which he had military police experience. Chief Lovorn gave Durr the usual response—there were no vacancies, but Durr would be notified when an opening occurred.

Never having been contacted about police employment, Durr reapplied with Lovorn on September 21, 1972. On the same day he also applied to Chief Chapius for a firefighter position. Durr received the familiar refrain from both Lovorn and Chapius. Thereafter, on September 25, 1972, he filed EEOC charges against the City, its officers and agencies. EEOC consolidated the Durr and Neely charges, with like results on the part of EEOC, and Durr, having received a right-to-sue letter, timely joined in the present action.

Like Neely, Durr heard nothing from Chapius or Lovorn before this action was commenced. Subsequently, however, on March 17, 1974, he was offered a fireman job by Chapius, which he refused as he was under consideration for a promotion by his employer, Universal Life Insurance Company. Between the date on which Durr applied for a fireman position and the date he was offered such employment, 3 white men were newly employed as firemen.

Durr was offered a patrolman position on June 10, 1974; he accepted and began work 5 days later. Between the date on which Durr initially applied for a patrolman position and the date he was hired, at least 10 white men were hired as patrolmen.

Durr is still employed by the Grenada police department. During the course of his service, his work has been entirely satisfactory; indeed, in July 1976 he was promoted to the rank of sergeant.

(3) Annie Louise Blackmon

Annie Blackmon is 28 years old; she holds a G.E.D. certificate and has completed a nurses' aide course at Holmes Junior College. She has work experience as a nurses'

aide, and is presently employed as a teachers' aide.

On June 6, 1973, she applied to the City for "any job available, except maid." [6] She was told that the City had no job vacancies, but that she would be contacted when something became available. She heard nothing until July 31, 1974, when she was contacted by Mrs. Turner by telephone, who stated that a position was open, but that Mrs. Blackmon would have to take tests at the State Employment Service to qualify for the job. When Mrs. Blackmon reported to the Employment Service, she learned that the test was a typing test. Since she could not type, she did not take the test.

In September 1974, Mrs. Blackmon received the City's form letter from Mrs. Turner inquiring as to Mrs. Blackmon's continuing interest in municipal employment. The latter indicated that she was still interested in such employment, and returned the letter to Ann Turner. Mrs. Turner testified that the letter was sent because Mrs. Blackmon failed to follow through with the typing test in connection with the prior job opening.

Thereafter, on October 21, 1974, Mrs. Turner mailed a certified letter to Mrs. Blackmon which stated that a clerk-typist position was open, and that if interested in the job, Mrs. Blackmon should contact her within 5 days. Mrs. Blackmon testified that she never received the letter; it was returned to Mrs. Turner as "unclaimed" with the notation "not at home." Mrs. Turner treated this as a lack of interest in city employment, and transferred the Blackmon application from the "active" to the "inactive" file. Although Mrs. Turner had Mrs. Blackmon's telephone number, and Mrs. Blackmon was a permanent resident in the city, Mrs. Turner made no attempt to call Mrs. Blackmon—as she had done on a previous occasion—concerning the clerk-typist job and to ascertain whether she had continuing interest in employment. Mrs.

---

**6.** It is not clear how employment applications which do not specify a position for which application is made are handled. Such applications are not readily susceptible to processing in the City's centralized application procedure.

Turner gave no reason for her failure to telephone Mrs. Blackmon, relying only on the postman's notation.

Unaware of the above events, Mrs. Blackmon in October 1974 had enrolled in a night typing course at Grenada High School, which she completed in December 1974, receiving a certificate of proficiency.

Never having heard from the City, Mrs. Blackmon reapplied on August 8, 1975, for "any job except maid that I can do, meter mail, file clerk." She has never been offered municipal employment of any kind, although whites have been hired in numerous positions since the date of her initial application.

## III.  THE APPLICABLE LAW

### A.  Class Claims.

■  Since plaintiffs Neely and Durr satisfied all Title VII prerequisites to suit, the court has jurisdiction of their individual claims brought under that Act, as well as such claims of the plaintiff class.[7]  See *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 256 (5 Cir. 1974).  Federal jurisdiction of the Neely and Durr individual claims, the class claims, and the individual claim of Annie Louise Blackmon founded on 42 U.S.C. § 1981 is also properly invoked;[8] jurisdiction of the individual claim of Annie Louise Blackmon also is proper under Title VII, even though she did not resort to Title VII administrative processes prior to institution of suit, since she is a member of the plaintiff class.[9]  As a practical matter, however, there is little significance, at least in this case, whether the action is brought under Title VII, § 1981, or both, as the standards for determining ra-

cial discrimination vel non are virtually identical for both, see *Pettway,* supra, and *Long v. Ford Motor Co.,* 496 F.2d 500 (6 Cir. 1974), and as "[i]n fashioning an appropriate remedy for employment discrimination, Congress has granted courts plenary equitable power under both Title VII . . . and section 1981," *Pettway,* supra, at 243. Our holdings are therefore equally applicable to the Title VII and 1981 claims.

■  To present a prima facie case in a class action alleging racial discrimination in employment, "it is incumbent on the *class* to establish that an employer's employment practices have resulted in cognizable deprivation to it as a class," *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 443 (5 Cir. 1974).  In other words, "[w]hat is necessary to establish liability is evidence that the *class* of black employees has suffered from the policies and practices of the particular employer." Id, at 443–44.  The class may establish such a prima facie case "either on the basis of statistical data by itself or by the use of statistical data and analyses supported by the evidence," *Wade v. Mississippi Cooperative Extension Service,* 528 F.2d 508 (5 Cir. 1976).

■  Fully cognizant that the strength of statistical proof is directly proportionate to the magnitude of the numbers involved, see *Ochoa v. Monsanto Co.,* 473 F.2d 318 (5 Cir. 1973), we nevertheless conclude that the historical racial composition of the work force of the City, coupled with the City's hiring practices, and specific experiences of the named plaintiffs and members of the plaintiff class undeniably establish a prima facie case of class-wide racial discrimination in hiring.

---

7.  Title VII, however, does not authorize an award of back pay against the individual defendant officials.  *Monell v. Dept. of Soc. Serv. of City of New York,* 532 F.2d 259 (2 Cir. 1976), cert. granted, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977).  *Contra, Byron v. University of Florida,* 403 F.Supp. 49 (N.D.Fla.1975).

8.  Jurisdiction is also properly invoked for plaintiffs' claims based on 42 U.S.C. § 1983, 42 U.S.C. § 2000d, and 31 U.S.C. § 1242.  Since complete relief can be granted under Title VII

and § 1981, however, our discussion will be addressed to the claims presented pursuant to these statutes only.

9.  "[I]t is not necessary that members of the class bring a charge with the EEOC as a prerequisite to joining as coplaintiffs in the litigation.  It is sufficient that they are in a class and assert the same or some of the issues." *Oatis v. Crown Zellerback Corp.,* 398 F.2d 496, 499 (5 Cir. 1968).

It cannot seriously be argued that in the past the City has not discriminated on the basis of race in its hiring. As the statistics set out in Parts II and III of this opinion clearly establish, blacks, although hired by the City in substantial numbers, historically have been employed only in low-paying, menial laborer/janitor positions. Prior to the filing by Neely and Durr of EEOC racial discrimination charges against the City, blacks were hired into non-labor/janitor employment only in token numbers. Indeed, the City has never hired a black directly into a position of supervisory authority over white employees.

■ The City did adopt ostensibly nondiscriminatory personnel policies in July 1974—6 months after suit was filed. Such policies, of course, must not only be fair in form, but must also be fair in operation. *Robinson v. Union Carbide Corp.*, 538 F.2d 652 (5 Cir. 1976), modified on other grounds, 544 F.2d 1258 (5 Cir. 1977). The evidence as heretofore catalogued emphatically demonstrates that the policies on hiring were not fair in operation, but instead have been largely ignored. The evidence further establishes that the City's centralized application procedure has been bypassed to favor white job applicants who could only have been recruited by word-of-mouth outside the centralized application procedure. Furthermore, adoption by the City of its 90-day reapplication rule and failure to provide meaningful notice of such requirement to black citizens has operated to thwart blacks in their attempts to secure municipal employment.

Hiring, even under the 1974 personnel policies, remains completely subjective. Department heads admit that they do not attempt to follow the City's job descriptions, which are, in themselves, vague.

While there has been an increase in the percentage of blacks hired into non-laborer/janitor positions since the filing of EEOC charges and this action, we are constrained to believe from the experiences of members of the plaintiff class that even greater numbers of blacks would have been so employed had the City not culled black applicants by means of the largely unpublished 90-day reapplication procedure, had there been implementation of a structured, objective hiring procedure, and had the City recruited through methods other than word-of-mouth. We therefore conclude that the plaintiff class has established racial discrimination in past and present hiring practices of the City.

"Once the plaintiffs establish(ed) a prima facie case, the burden [falls] to the defendants to rebut the statistics or to explain the disparity in hiring," *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40 (5 Cir. 1974), reversed and remanded in part on other grounds, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). As to historical hiring practices, defendants attempt no genuine rebuttal: "The major premise of the defense in the instant case is not that blacks were never discriminated against, but that even if there was (sic) discrimination at one time it has ended," Brief of defendants at 12. This court, as stated, does not agree that defendants' current hiring practices are nondiscriminatory. Defendants stress the allegedly good faith efforts of City Manager Criss in instituting the centralized application procedure, the uniform personnel policies, and the City job descriptions (none of which, as noted, has been consistently applied). However "the intent of employers who utilize . . . discriminatory procedures is not controlling since 'Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation,'" *Robinson*, supra, 538 F.2d at 657, quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

■ Once it is shown that a current employment policy or practice produces a discriminatory result, the defendants may justify such policy or practice as a "business necessity." See *Pettway*, supra, 494 F.2d at 244. For the business necessity defense to vindicate an employment policy or practice which has a discriminatory effect,

the business purpose must be sufficiently compelling to override any racial impact, the challenged practice must effectively

carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accommodate the business purpose advanced, or accomplish it equally well with lesser or differential racial impact. *Robinson v. Lorillard Corp.,* 444 F.2d 791, 798 (4 Cir.), cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

Defendants here did not attempt to justify the City's totally subjective hiring standards, 90-day reapplication policy, or practice of word-of-mouth recruitment as business necessities. Indeed, in the court's opinion, these policies and practices could not meet the business necessity test set forth above. Surely there is an acceptable alternative to completely subjective hiring standards which would to a greater degree guard against racial discrimination by the City's all-white hiring force. Similarly, while the 90-day reapplication rule possibly could meet the business necessity test if it were made known to all applicants for municipal employment, the court can see absolutely no justification for the present clandestine implementation of the policy. Finally, it cannot be argued that recruitment solely by word-of-mouth can be justified where an employer has a majority white current work force and a history of racial discrimination in employment. *United States v. Georgia Power Co.,* 474 F.2d 906 (5 Cir. 1973).

In addition to finding that racial discrimination in hiring has been shown, the court further finds that the plaintiff class has presented a prima facie case of racial discrimination in promotions. As set out in Parts II and III of the opinion, blacks have received significantly fewer promotions than whites, and only two blacks have been promoted to positions with any supervisory authority over white employees; both blacks so promoted were promoted in 1976. The strength of plaintiffs' promotion statistics is bolstered by the City's promotions policies. As stated earlier, employees are given no notice of vacancies into which they might seek promotion, or of the necessary qualifications for such positions. Both be-

fore and after adoption of the City's 1974 personnel policies, promotional decisions have rested solely with department heads, all of whom are white. Although the 1974 policies list several factors to be considered in making promotion decisions, the policies have not been followed by department heads; instead, they have relied solely on their subjective judgment. "Such high-level subjectivity subjects the ultimate promotion decision to the intolerable occurrence of conscious or unconscious prejudice," *Robinson v. Union Carbide,* supra, 538 F.2d at 662.

Related to plaintiffs' prima facie showing of discrimination in promotion are the failure of department heads to prepare employee evaluations for black employees in accordance with the 1974 policies, and the City's training of new hires. Failure to prepare the evaluations indicates that as a class, blacks are not seriously considered for promotions. Training, on the other hand, necessarily influences an employee's job performance, obviously an important consideration in promotions. Since newly hired black employees are often dependent on veteran white employees for training, and since there is generally no formalized training, the potential for discriminatory training is clearly present, and in fact, it was shown that such discrimination has occurred. Furthermore, the evidence established that blacks were not provided outside, formal, training on the same level as whites. "[D]issimilar treatment from the training whites receive or treatment similar on its face but dissimilar in its effects upon racial minorities and unfounded on business necessity" violates both Title VII and § 1981, *Long v. Ford Motor Co.,* supra, 496 F.2d at 505.

■ Defendants again seek to rebut plaintiffs' showing of discrimination by asserting their promotional policies and practices have been in good faith, but as stated above, good faith will not excuse policies and practices with discriminatory effects. Also, it cannot be said that business necessity justifies racially discriminatory, entirely

subjective promotional decisions, made without notice of vacancies or qualifications for such vacancies, or that business necessity validates racially discriminatory training of black employees. We conclude that plaintiffs have established a case of class-wide racial discrimination in training and promotions.

■ Although plaintiffs attempted to prove class-wide discrimination in wages, terms and conditions of employment, and discharges, they failed to present any meaningful statistics or other evidence to establish cognizable discrimination in any of these areas against blacks as a class. No evidence was introduced which demonstrated disparate pay between blacks and whites performing the same jobs with the same skills. Only one incident of differing terms and conditions of employment was shown—that involving Jerry Weir in the fire department; similarly, only one credible incident of a racially motivated discharge was presented—that of Willie Joe Hundley in the water department. The court does not feel that the isolated instance of possible racial discrimination are sufficient to establish a prima facie case of such discrimination in terms and conditions of employment or in discharges.

### B. The Named Plaintiffs.

■ Named plaintiffs Jasper Neely, Joe Durr, and Annie Louise Blackmon all established that they are black persons, that they applied in writing for municipal employment, that they were qualified for such employment—Neely and Durr for firemen or patrolmen, Blackmon for clerical or similar employment (not requiring typing)—and that they were not offered such employment, while whites applying subsequently were offered such employment. We believe that such a showing, on the facts of this case, is sufficiently within the ambit of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to establish a prima facie case of discrimination against the named plaintiffs on the basis of their race.

"[O]nce the plaintiff has made out his [individual] prima facie case we look to the defendant for an explanation since he is in a position to know whether he failed to hire a person for reasons which would exonerate him," *Hodgson v. First Federal Savings and Loan Ass'n.,* 455 F.2d 818, 822 (5 Cir. 1972). Defendant Lovorn at trial contended that he in fact offered Neely the first patrolman position to become available which was not filled by persons with date of application earlier than Neely's, and that he also made unsuccessful attempts to contact Durr by telephone to offer Durr patrolman employment, leaving messages for Durr to return his calls, but that he was never able to contact Durr. The court rejects Lovorn's testimony, which was controverted by Neely and Durr, and concludes that Neely has never been offered police employment solely because of his race, and that Durr was neither offered such employment nor were attempts made to offer him such employment, prior to June 10, 1974, solely because he is black.

Defendants contend that since Annie Louise Blackmon was contacted concerning municipal employment in July 1974, she cannot have been discriminated against. This contention, however, ignores the fact that Mrs. Blackmon was not qualified to fill the position about which she was contacted, and that in September 1974, she reaffirmed her continuing interest in any City job for which she was qualified. The events of October 1974, outlined above, were used by defendant Ann Turner as an excuse to place Mrs. Blackmon's application in an inactive status, thus ending her chances for municipal employment. The court concludes that Mrs. Turner's actions were unreasonable under the circumstances, and that Annie Louise Blackmon was not offered city employment solely because of her race.

### IV. RELIEF

■ Although the court bifurcated the issues of liability and relief, we deem it appropriate that our order issued herewith preliminarily and permanently enjoin all racially discriminatory practices by defendant

City and its officials in the areas of hiring, promotion and training of City employees, so that no one shall be discriminated against by the City as an employer on account of his race. To aid the court in formulating an appropriate affirmative action program in the hiring, promotion and training of employees and potential employees of the City of Grenada, in accordance with the purport of this opinion, counsel for the parties shall, within 45 days from this date, submit to the clerk of this court detailed, specific proposals and counter-proposals, including such recommendations as may be needful to overcome the effects, and compensate for, current as well as past racially discriminatory employment practices by the defendant City of Grenada and its present and former officials in the various municipal departments.

> As to back pay, it is well settled that Once a court has determined that a plaintiff or complaining class has sustained economic loss from a discriminatory employment practice, back pay should normally be awarded unless special circumstances are present. *Pettway, supra,* at 252.

We here find no special circumstances that would serve to relieve defendants from liability for back pay. It is essential, of course, that we define the contours of the plaintiff class limitation regarding back pay claimants. Again, *Pettway* gives us specific guidelines in this respect:

> Once class-wide discrimination has been demonstrated to result in disproportional earnings, a class-wide decision that back pay is appropriate can be discerned without deciding which members of the class are entitled to what amount. *Pettway, supra,* at 257.

The purpose of back pay is to make whole any members of the class who have suffered economic loss as the result of racial discrimination. It thus becomes necessary to provide an appropriate form of notice, pursuant to Rule 23(d)(2) in order that the members of the plaintiff class may, in accordance with directions contained in the notice, immediately identify himself or her-self as a back-pay claimant, assert the amount of their monetary claims, measured from the date of racial discrimination suffered by such claimant to this date, and subtract from their claim (the salary which he or she would have otherwise earned had he or she been hired or promoted by the City) such wages as may have been earned in other employment. Our order shall make specific provisions for the giving and publishing of such notice to the plaintiff class.

Personal liability, if any, of the defendant former and present officials under § 1981 with respect to any back pay claims which may be awarded against the City shall depend upon the facts of individual claims determined in accordance with the standards enunciated in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Let an order issue accordingly.